LaVern HALVERSON, Appellee,

v.

LINCOLN COMMODITIES,
INC., Appellant.

No. 63820.

Supreme Court of Iowa.

Oct. 15, 1980.

Steven L. Nelson, of Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, for appellant.

Robert B. Scism, of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellee.

HARRIS, Justice.

This dispute centers on wages which had been withheld on the employer's claim that the employment contract was breached. The trial court granted summary judgment for the employee. We think that summary judgment was inappropriate and accordingly reverse the judgment of the trial court and remand the case for further proceedings.

In October 1972 plaintiff LaVern Halverson (Halverson), left his position as representative of a well–known stock brokerage firm to join defendant, Lincoln Commodities, Inc. (Lincoln), as a futures trader. Lincoln is a futures commission merchant and floor broker in commodities as those terms are defined by the Commodity Futures Trading Commission Act of 1974. Under the oral contract of employment Halverson was to receive one–third of the gross commissions on his trade against a draw of $3000 per month, plus, five percent of the profits of Lincoln's Des Moines office. Two of Halverson's clients, Thomas Meade and Ray W. Olson, incurred substantial losses in their individual margin accounts. These losses resulted in actions by Lincoln which in turn led to Halverson's suit.

In the first quarter of 1973 Meade suffered total account debits of $149,312.25 by failing to meet his margin calls. Lincoln contended that Halverson had accepted personal liability for these debits under his contract of employment and hence began withholding a percentage of his compensation. This percentage was thereafter periodically increased. By March 31, 1973, $19,180.32 was withheld from the amount owing to Halverson.

The losses of Olson were even more extensive than Meade's, reaching $180,000.

(Halverson's affidavit sets the figure at $187,000). As a result Lincoln, on January 26, 1976, increased its withholdings from Halverson's draw. By March 1, 1976, Lincoln had withheld a total of $35,687.43. Halverson resigned.

Halverson denies his contract of employment included an agreement making him personally liable for his clients' debits. He asserts that he learned Lincoln would hold him responsible only at the time of Meade's failure to meet the calls. At that time Lincoln issued a memorandum to that effect. In his testimony in support of his motion for summary judgment Halverson testified:

> Let me point out that I would never have agreed to a policy of my personal guaranty of a debit in the commodities business. One debit, given the right kind of markets where they were long limit for days and days and days and days, could not only wipe out a large sum of money, it could wipe out every dime I would earn in my entire life. I would not agree to that kind of liability.

Halverson also contends that he subsequently demanded, to no avail, Lincoln's express authorization to sell out Meade's nonsecured account. He says that, had he sold out the account, its deficit would have been substantially lessened.

Lincoln filed a resistance to the motion for summary judgment, supported by deposition. Gordon Linn, Lincoln's vice–president, contended that Halverson had accepted personal liability for his clients' debits as a condition for employment. In practice, Linn stated, no distinction would have been made between bad debts resulting from a client's speculation and debits arising from the broker's mistake in executing a transaction. Linn insisted that Halverson had been plainly told before commencing his employment of his responsibility for the debits. Linn said he impressed upon Halverson the significant relationship between Lincoln's payment of what Linn thought was then the highest commission rate in the field and the broker's responsibility for all account debits.

Linn conceded that no written statements of policy had been drafted at the time Halverson accepted employment. Instead, as Halverson testified, Linn's letter of May 16, 1973, following Meade's difficulties, was Lincoln's first commitment of its policy to writing. Linn also conceded that Halverson lacked authority to sell out an account that had missed a margin call or had otherwise become unduly speculative. Power to sell out such an account was reserved by Lincoln to itself; its brokers were required to obtain specific authority from Lincoln's headquarters in Chicago for any such undertaking.

After trial in federal court in December 1975, Lincoln secured a judgment against Meade and, on August 15, 1977, recovered the principal of Meade's debits plus interest and costs. *See Lincoln Commodity Services v. Meade*, 558 F.2d 469, 471–72 (8 Cir. 1977). Nevertheless Lincoln denied Halverson any reimbursement for its withholdings upon the subsequent losses by Olson.

In this suit Halverson sought compensatory damages of $36,729.90, punitive damages of $100,000, and attorneys fees in the amount of $15,000. Lincoln answered and counterclaimed against Halverson, claiming $299,680.35 for Halverson's asserted breach of his contract of employment.

Halverson's amended motion for summary judgment was sustained, resulting in judgment against Lincoln in the amount of $35,687.43 in actual damages, an equal amount in liquidated damages and $10,000 in attorneys fees. Lincoln's counterclaim was summarily dismissed. This appeal followed.

I. The trial court based its ruling in part on a holding that the provision for Halverson's personal liability for his clients' debits must be void or voidable for its contravention of public policy. Lincoln is right in insisting that such claim falls outside the parameters of this suit. As issues were joined for trial there was never any claim that the provision was thus void or voidable. Iowa R.Civ.P. 101 requires that "any defense that a contract or writing sued on is void or voidable ... must be specially pleaded." The trial court holding accordingly cannot be affirmed on this ground. *Graham v. Kuker*, 246 N.W.2d 290, 292 (Iowa 1976).

Another of Halverson's contentions cannot be considered on appeal because it was not urged before the trial court. He now argues that one of Lincoln's pleadings characterized him as an "employee" and that this characterization should be considered an admission. We can find no reference to such an argument prior to Halverson's brief on appeal. Hence, we give it no further consideration.

The scope of our review was stated in *Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795-96 (Iowa 1978):

> In reviewing the grant or denial of summary judgment motions, we view the underlying facts contained in the pleadings and the inferences to be drawn therefrom in the light most favorable to the party opposing the motion, and give to such party the benefit of any doubt as to the propriety of granting summary judgment. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied, and to reverse the grant of summary judgment if it appears from the record there is an unresolved issue of material fact.

II. In 1975 Iowa adopted the "Iowa wage payment collection law" chapter 90, Acts of the 66th G.A., 1975 Session. Two pertinent sections of the act are as follows:

> When the employment of an employee is suspended or terminated, the employer shall pay all wages earned, less any lawful deductions specified in section 91A.5 by the employee up to the time of the suspension or termination not later than the next regular payday as provided in section 91A.3. However, if any of these wages are the difference between a credit paid against wages determined on a commission basis and such wages actually earned on a commission basis, the employer shall pay such difference not more

than thirty days after the date of suspension or termination. . . .

§ 91A.4.

1. An employer shall not withhold or divert any portion of an employee's wages unless:

a. The employer is required or permitted to do so by state or federal law or by order of a court of competent jurisdiction; or

b. The employer has written authorization from the employee to so deduct for any lawful purpose accruing to the benefit of the employee.

2. The following shall not be deducted from an employee's wages:

. . . .

b. Losses due to acceptance by an employee on behalf of the employer of checks which are subsequently dishonored if the employee has been given the discretion to accept or reject such checks and the employee does not abuse the discretion given.

§ 91A.5.

■ We agree with Lincoln that the trial court erred in summarily applying these two sections in favor of Halverson because there existed at least three factual disputes. (1) Lincoln's officer in the contract negotiations testified that Halverson admitted he would be responsible for bad debts on his accounts. Lincoln offered other testimony to substantiate the claim. Halverson on the other hand flatly denied he would be so responsible. (2) If Lincoln did not have the right to demand reimbursement for the Halverson accounts then Halverson's claims against Lincoln accrued when the amounts were withheld by Lincoln from Halverson's commissions. The date of that accrual in turn would trigger the running of the statute of limitations, a separate defense to be discussed later. (3) There is also a factual issue in dispute on the question of whether Lincoln intentionally violated the statute. Section 91A.8, The Code, permits an employee to recover liquidated damages, such as were allowed here, only if the employer "intentionally" violated the statute.

Summary judgment under Iowa R.Civ.P. 237 was wholly inappropriate with these issues in dispute. *Drainage Dist. No. 119, Clay County v. Inc. City of Spencer,* 268 N.W.2d 493, 499 50 (Iowa 1978).

III. The trial court also granted summary judgment against Lincoln on its counterclaim. We think this was also error for the same reasons we found summary judgment inappropriate for Halverson on his petition.

Even deciding the applicability of sections 91A.4 and 91A.5 upon further proceedings will not necessarily dispose of the counterclaim. It will also be necessary to resolve the factual disputes, especially the one which is central to this suit: Did Halverson agree to be personally responsible for his clients' accounts?

IV. Because they may recur on remand we should comment briefly on some of the other assertions of the parties.

■■ A. Chapter 91A includes no provision for limitations of its own. Accordingly, under section 614.1(2), a two year limitation controls. In cases of employment the statute begins to run when compensation becomes due or payable. *Sammon v. Roach,* 211 Iowa 1104, 1106 07, 235 N.W. 78, 79 (1931). *See Mid Continent Petroleum Corporation v. Keen,* 157 F.2d 310, 316 (8 Cir. 1946).

As Lincoln argues, Halverson waited until February 23, 1977, to file his petition. Therefore, under section 614.1(2), he may recover only those withholdings which occurred after February 23, 1975. The trial court found that most withholdings preceded that date.

Halverson responds that his cause of action accrued on the basis of indemnity or suretyship. He argues that, even if he should be held liable to Lincoln as guarantor, he became entitled to reimbursement when Lincoln satisfied the judgment against Meade on August 15, 1977.

Of course Halverson's wages were due and owing when the amounts were deducted by Lincoln from his commissions. Any withholdings which were unauthorized and wrongful accrued at that time. 38 Am.

Jur.2d, Guaranty, § 121. But it does not necessarily follow that the statute of limitations ran from the same time.

After further proceedings resolve the factual disputes, a number of legal principles may bear on the running of a statute of limitations. Halverson may establish his claim on a theory that he should be reimbursed for amounts he paid as Meade's guarantor. If so the following rule would apply:

Where a guarantor, who has entered into a contract of guaranty at the request of, or with the consent of, the principal obligor, pays or is compelled to pay his principal's debt, the law raises an implied promise, unless there is an express one, on the part of the principal to reimburse the guarantor, and on the payment of the debt the guarantor at once has a right of action against the principal for reimbursement of the amount which he has paid, with interest thereon at the legal rate.

38 C.J.S. Guaranty § 111 p. 1298. Such a theory of recovery would not be one for wages and hence would not be subject to the two–year statutes of limitations.

If there is doubt as to which of two or more statutes of limitation applies to a particular action or proceeding, and it is necessary to resolve the doubt, it will generally be resolved in favor of the application of the statute containing the longest limitation.

53 C.J.S. Limitation of Actions § 107, p. 1094.

Other statutes might become applicable. For example *see* section 622.32(2), The Code 1979 (statute of frauds for guaranty), and section 614.12, The Code 1979 (outlawed claim can be asserted as a counterclaim).

B. Section 91A.13 proscribes retroactive effect of the Iowa wage payment collection law: "This chapter shall not authorize the commissioner or any other person to take any assignment of wages or commence any action that is based on an act committed prior to July 1, 1975," The trial court held this section inapplicable on the same suretyship principle. That is, the trial court held

that Halverson's loss could not have accrued before August 15, 1977, when Lincoln's judgment against Meade was satisfied.

We have said that on remand Halverson may establish his guaranty theory. Applicability of section 91A.13 will turn on whether the theory is so established.

■ C. Lincoln separately contends that chapter 91A should be found inapplicable by reason of a part of the statutory definition of wages: "[T]he assets of an employee in a fund for the benefit of the employee, whether such assets were originally paid into the fund by an employer or employee, are not wages." § 91A.2(4)(c). We agree with Halverson that the definition does not support the contention. Lincoln's argument in this respect necessarily presupposes that Halverson should be found liable as a contractual guarantor and hence the argument is circular. Before the definition could be applied, Lincoln would already have established Halverson's liability.

■ D. Lincoln argues that chapter 91A should be held inapplicable by reason of the statutory definition of employee: "Employee means a natural person who is employed in this state for wages by an employer. Employee does not mean a licensed person employed on a contractual basis for professional services." § 91A.2(3). Lincoln invites us to take judicial notice that Halverson's activities were regulated by the Commodity Futures Trading Commission. We can pass the question of whether this is a fact of such general knowledge as to be appropriate for judicial notice. *See Motor Club of Iowa v. Dept. of Transp.*, 251 N.W.2d 510, 517 (Iowa 1977). Even if notice were taken there still is insufficient evidence to establish Halverson as a professional person within the meaning of the statute.

The changing meaning of the word profession is well explained at 72 C.J.S. Profession 1215--20. Authorities, cited *id.* 1219, indicate that ordinarily brokers have not been thought to be engaged in the practice of a profession. We adopted a definition of profession in a number of cases including

*State v. Winneshiek Co–op Burial Ass'n,* 237 Iowa 556, 561, 22 N.W.2d 800, 803, 165 A.L.R. 1092, 1096 (1946).

■ It will be up to the trial court upon remand to determine whether the calling in which Halverson is engaged is a profession. Under the foregoing authorities[1] it is apparent that there are two tests, both of which must be passed, for a vocation to qualify as a profession. The first test is the preparation required. A profession requires more than mere training. It presupposes special mental and other attainments, special discipline and a liberal education, or its equivalent. The second test has to do with the purpose of the calling. A profession necessarily involves public service. Such service, though incidentally providing a livelihood, primarily has to do with furnishing for others a needed faculty which they cannot provide, at least as well, for themselves. In passing either test it must be borne in mind that something more is required than would suffice for a skill or a craft.

E. The parties dispute the meaning of section 91A.8 which prescribes the damages recoverable by an employee. The section allows liquidated damages where an employer has intentionally failed in his obligation to pay. In the event that proceedings on remand result in judgment against Lincoln under chapter 91A, the claim for liquidated damages should be governed by the following which we note and approve:

> Under a statute which fixes a penalty for failure to pay wages promptly on termination of employment, the employer incurs no penalty if at the time of termination there was an honest dispute between the employer and the employee as to the amount due, especially if the employer was correct in his assertion of the amount actually due. Moreover, it has been held that an employer does not incur a penalty for failure to pay wages at termination until the amount due is ascertainable by the exercise of reasonable

diligence, so that no penalty accrues against an employer in favor of a discharged employee who is indebted to the employer for money of the employer in the employee's hands but not turned over to the employer or accounted for by the employee.

A statute which penalizes an employer who "wilfully" fails to pay wages on discharge or termination of employment penalizes only those employers who do not pay even though they know that the compensation is due. Hence, a good-faith dispute as to whether any wages are due is a defense to an action for such penalties.

48A Am.Jur.2d, Labor and Labor Relations, § 2617.

Other matters raised are not likely to recur upon remand. The judgment of the trial court is reversed and the case is remanded for further proceedings in accordance herewith.

REVERSED AND REMANDED.

All Justices concur, except REYNOLDSON, C. J., and SCHULTZ, J., who take no part.

---

[1.] Of course these views do not control special statutes in which the legislature has defined professions for special purposes. *See Cedar*

*Mem. Park Cem. Ass'n. v. Personnel Assoc., Inc.* 178 N.W.2d 343, 346 (Iowa 1970).