**EATON CORPORATION, Appellee,**

v.

**David W. GIERE; Dikon Manufacturing Company, Appellants.**

No. 91–3284.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1992.
Decided July 27, 1992.

Richard P. Clem, Minneapolis, Minn., argued, for appellants.

J. Michael Amrein, Chicago, Ill., argued (R. Scott Davies, Minneapolis, Minn., and Michael H. King and John K. Stromsta, Chicago, Ill., appeared on the brief), for appellee.

Before WOLLMAN and HANSEN, Circuit Judges, and ROY,* Senior District Judge.

ROY, Senior District Judge.

The plaintiff/appellee in this action, Eaton Corporation, is a company which manufactures, among other things, hydrostatic (hydraulic) transmissions and transaxles.[1] Appellant David Giere is a former employee of Eaton who resigned after working for Eaton for about 10 years as a mechanical engineer specializing in the field of hydrostatic transmissions. Appellant Dikon Manufacturing Company ("Dikon") is a corporation Giere formed after leaving Eaton for the purpose of selling a transaxle which he developed while still working there.

The appellant appeals from the district court's[2] final judgment entered September 17, 1991 in favor of Eaton. The district court had previously determined that Giere had breached his employee agreement with Eaton, together with certain fiduciary duties owed to Eaton. The district court enjoined Giere from any further breaches of same and also declared the transmission

---

* The HONORABLE ELSIJANE TRIMBLE ROY, United States Senior District Judge for the Eastern District of Arkansas, sitting by designation.

1. A hydrostatic transaxle is a hydrostatic transmission and a drive axle constructed as one integral unit.

2. The Honorable Edward J. Devitt (dec.), United States District Judge for the District of Minnesota.

device which is the subject of this lawsuit to be the exclusive property of Eaton. For the reasons set out below, the order and judgment of the district court will be affirmed.

## I.

Like most manufacturers, Eaton carefully guards its manufacturing and production techniques. Such information is especially important to the profitability of Eaton's transmission products since hydrostatic transmissions and transaxles are relatively simple devices conceptually. Out of necessity, Eaton reveals such confidential information to its engineers and other employees on a "need-to-know" basis. However, it requires all such employees to sign employee agreements which require the employee to agree not to use or reveal any such confidential data outside the course of his work at Eaton.

David Giere signed such an agreement when he started working for Eaton as a product engineer on January 2, 1980.[3] A second employee agreement was signed by Giere at the insistence of Eaton on April 21, 1987, which was slightly less restrictive. Eaton sued the appellants because of an alleged breach by Giere of the later employee agreement. Both agreements provided that anything an employee made or invented while working for Eaton, if it were something related to the employee's work, would become the property of Eaton. They also prohibited the unauthorized disclosure of "any secret or confidential information."

Giere's position with Eaton was his first engineering job after graduating from college. It should be noted that Giere had taken no courses directly related to transmissions, transaxles, or pumps while in school. All of his training in this field came after commencing work with Eaton. By all accounts, Giere did well at his job and eventually became the project engineer on several design projects for transaxles while at Eaton. Two models in particular were Models 750 and 850, smaller models which represented "Eaton's attempt to sat-isfy a growing interest for hydrostatic transmissions and transaxles that could be used for smaller riding lawn mowers, walk-behind mowers and snowblowers." *Eaton v. Giere,* No. Civ. 3–90–439, slip op. at 2, 1991 WL 352744 (D.Minn. April 30, 1991).

In December of 1989, Giere was transferred to a different products line. He apparently was having some disagreement with his superiors as to product development. Soon after taking his new job assignment, he grew professionally dissatisfied and began working at home on the design of a hydrostatic transmission device of his own. In about February of 1990, Giere contacted The Toro Company, one of Eaton's largest customers, and showed engineering drawings of his device to Toro personnel. He also corresponded with Toro regarding the pricing of his device and even entered into a non-disclosure agreement with Toro. *Id.* at 3.

On June 18, 1990, Giere informed Eaton of his plans to develop and market his own competitive device. Two days later he submitted his letter of resignation, effective immediately.

Five weeks after that, the plaintiff filed suit against Giere, alleging these five counts:

    1) misappropriation of trade secrets,

    2) breach of employee agreement,

    3) breach of fiduciary duties,

    4) tortious interference with prospective economic advantage, and

    5) unfair competition.

Eaton later amended its complaint to include Dikon.

On August 1, 1990, the district court entered a temporary restraining order prohibiting the appellants from continuing to develop and market Giere's transmission device. In April of 1991, the district court entered summary judgment for Eaton on Count II (breach of employee agreement) and Count III (violation of fiduciary duty). The court found that genuine issues of material facts remained on the other counts and denied the appellants' motion for sum-

---

**3.** It is not disputed that the agreement was signed Giere's first day on the job.

mary judgment on those. In September of 1991, the district court entered final judgment in favor of Eaton, permanently enjoined the appellants from "engaging in any effort to design, develop or market" the device in question, and declared the device to be the property of Eaton. Giere filed this appeal.

## II.

Summary judgment is appropriate only when the district court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Furthermore, "a motion for summary judgment must be viewed in a light most favorable to the non-moving party, and that party must receive the benefit of all reasonable inferences to be drawn from the underlying facts." *Ivan Spencer v. Kroger Company,* 941 F.2d 699 (8th Cir.1991), quoting *Agristor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987).

The chief issues presented are:

A) Whether the District Court properly granted summary judgment in Eaton's favor as to the "breach of employee agreement" claim (Count II).

B) Whether the District Court properly granted summary judgment in Eaton's favor as to the "fiduciary duty" claim (Count III).

The appellee contends that the trial court properly entered summary judgment on Counts II & III, i.e., that there were no genuine issues as to any material facts regarding Giere's conduct and that said conduct constituted a breach of the employment agreement and a violation of Giere's fiduciary duty to Eaton as a matter of law.

It should be pointed out that these can be regarded as alternative means of holding for the plaintiff. Eaton did not seek or receive any form of monetary damages in this case. The injunctive relief granted Eaton is fully justified if the district court's holding on *either* Count II or Count III [4] is affirmed. We find the district court's decision should be affirmed on both Count II (breach of employment agreement) and on Count III (violation of fiduciary duty).

### A. Employment Agreement

■ Giere admits that he read and signed two employment agreements with Eaton; the first when he started work there on January 2, 1980, and the other on April 21, 1987. However, he argues that the execution of the second agreement was not supported by adequate consideration. He says he either had to sign it or he would lose his job.

The original agreement executed when he started work is clearly supported by consideration. *See, e.g., Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1092–93 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir. 1982). Furthermore, the 1980 agreement was never terminated or formally superseded. It is enforceable under Minnesota's "blue pencil doctrine." *See Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264, 1269 (8th Cir.1978). In other words, even if the later agreement were found not to be supported by adequate consideration, the earlier agreement would still be binding on Giere.

Eaton argues that the second agreement *is* supported by consideration because it "substantially *expanded* Giere's rights." *Appellee's brief at 14 (emphasis in original).* It is certainly true that Giere was provided more rights by Eaton under the 1987 agreement, though this would seem to be "making virtue out of necessity" since more liberal inventors' rights had been required by the adoption of Section 181.78 of the Minnesota statutes.[5,6] In any case, we

---

**4.** The appellants did not argue that, even if the Court were to affirm the district court's findings as to breach of the employee agreement or the violation of Giere's fiduciary duty to Eaton, the remedy imposed by the district court might be too severe or otherwise improper.

**5.** The 1980 agreement provided, in part, that:

1. Any inventions or improvements that I may make or suggest while in the employ of EATON relating to the products, manufacturing processes or equipment in connection therewith of EATON or to any such needs or

**6.** See note 6 on page 140.

agree with the district court's finding that "there was legal consideration for both Employment Agreements signed by Giere."

We hold that adequate consideration existed to support *both* employee agreements. Furthermore, even if the 1987 agreement were not, the earlier agreement was clearly supported by adequate consideration.

\*   \*   \*

■ More than one reason exists why the 1987 agreement can be regarded as breached. One is that the new device so obviously "relate(s) ... to the business of Eaton ...". Simply put, Giere made light-duty transaxles for machinery *for* Eaton while working there. He then started designing, with the idea of manufacturing and selling, similarly sized transaxles for the purpose of competing *against* Eaton.

Though there were minor differences between his version and the ones made by Eaton, there were striking similarities. For example, both Eaton's products and Giere's device are hydrostatic transmission devices containing a radial ball piston pump and a motor in one housing. The use of a radial ball piston pump and an aluminum housing within an iron pump journal and a rotatable cam ring was unique to Eaton until Giere decided to go into business for himself. It would stretch the imagination and do damage to the English language to find that Giere's device was not "related" to Eaton's business.

The evidence suggests that Giere's device is very similar to Eaton's Model 7 Hydrostatic Transmission, but smaller so to be appropriate for snowblowers and riding mowers smaller than the ones fitted with the Model 7. The fact that Giere's device might have been targeted for a market that Eaton had not yet been able to crack is not significant because it remains unrefuted that this was an area of "Eaton's actual or demonstrably anticipated research and development," (see language of 1987 agreement, n. 5) and this is all Eaton needed to show to satisfy the "relating to" test.

Another reason the agreement can be regarded as breached is that the design and specifications for Giere's device were obviously direct results from his work at Eaton. Giere was able to take a great many shortcuts in time and money spent on research, development, testing, and specifications because of his previous work on similar products he helped design and make at Eaton. The fact that he actually designed and made *his* device at home and *after* hours is of little relevance.

It is apparent that Giere's device, and his ability to design such a device, directly resulted from his work at Eaton. Furthermore, it is "unrealistic to expect that [Giere did] not utilize confidential information gained at [Eaton]" to make his own 6device. *Modern Controls*, 578 F.2d at 1270.

developments of EATON or to the manufacture of the same, shall, without further consideration, immediately become the property of EATON.

\*   \*   \*   \*   \*   \*

4. Unless I shall first secure the written consent of EATON, I shall not disclose or use at any time either during or subsequent to my employment ... any secret or confidential information of EATON which I have acquired during said employment, whether or not developed by me.

January 2, 1980 Employee Agreement, 1 & 4 (Appellee's Appendix at 85).

The 1987 agreement read, in part, as follows:
Any discoveries, inventions, improvements and expressions of ideas that I may make or suggest while in the employ of Eaton relating to the products, manufacturing processes or equipment in connection therewith of Eaton

or to any such means or developments of Eaton or to the manufacture of the same, shall, without further consideration, immediately become the property of Eaton; however, *this agreement shall not apply to a discovery, invention, improvement or expression of idea,* for which no equipment, supplies, facility or trade secret information of Eaton was used and which was developed entirely on my own time, and *(1) which does not relate (a) to the business of Eaton, or (b) to Eaton's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by me for Eaton.*

April 21, 1987 Employee Agreement, 2 (Appellee's Appendix at 86) (emphasis added).

6. The language added to the Employee Agreement in 1987 tracks the language of Minn.Stat. Ann. § 181.78 almost word for word.

Such use would clearly violate Paragraph 5 of the 1987 agreement.[7]

### B. Fiduciary Duty to Eaton

With regard to Count Three, Giere's fiduciary duty to Eaton was breached in at least two respects; Giere's duty of confidentiality to Eaton and his duty of loyalty to Eaton. The breach of confidentiality can be further divided into Giere's *contractual* duty, and a *common law* duty of confidentiality.

Paragraph 5 of the Employee Agreement states that unless Giere got prior permission, he could not "disclose or use at any time ... any secret or confidential information of Eaton ... which I have acquired during said employment, whether or not developed by me." Yet the drawings he showed to prospective customers incorporated specific matters from Eaton drawings that were confidential, even if they did not rise to the level of a "trade secret."

 Even when there is no contractual duty, employees have a common law duty not to use trade secrets or confidential information obtained from their employer. *Jostens, Inc. v. National Computer Sys.*, 318 N.W.2d 691, 701 (Minn.1982). Thus, either way, Giere violated his duty of confidentiality to Eaton.

 With regard to breaching a duty of loyalty, an employee owes his employer a duty of loyalty which prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while he is still employed. *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn.1987). Giere's blatant and admitted solicitation of Toro's business prior to his leaving Eaton would obviously violate this duty.

For example, Giere admitted during his deposition that he approached Toro, one of Eaton's chief customers, about buying his device while he was still working for Eaton

in the spring of 1990 and that he also had several meetings with Toro representatives during that time.

While working on his device he contacted the vendors of components he might use in the production of his product. He also contacted machinists and other subcontractors, all for the purpose of preparing price information for Toro. Furthermore, he repeatedly contacted Toro for the purpose of informing them of his progress in development of his product and his efforts to fix a price at which he could sell the device to Toro. This was all while he was still working for Eaton.

That Giere felt the need to hide his activities from his employer is apparent from his communications with Toro while still employed by Eaton. On February 12, 1990 he wrote: "[i]t is important to me to limit exposure of this project, so for now, Toro will be the only manufacturer of riding mowers I talk to." *Appellee's Appendix at 247.* In May he wrote "[i]n anticipation of further discussions of these products and their designs I am enclosing a non-disclosure agreement with this letter. It will need to be approved prior to those discussions." *Id.* at 249.

The district court's determination that Giere violated his fiduciary duties to Eaton of loyalty and confidentiality is well grounded in the law and supported by the record. It will not be disturbed by this court.

### III.

The district court's entry of summary judgment for Eaton on Count II (breach of his employee agreement) and on Count III (violation of fiduciary duty) is affirmed. Likewise, its denial of the Appellants' motion for summary judgment on the other counts is affirmed.

---

**7.** Paragraph 5 of the 1987 agreement reads as follows:

Unless I shall first secure the written consent of Eaton, I shall not disclose or use at any time either during or subsequent to my employment, except as required in my duties to Eaton, any secret or confidential information of Eaton or which has been entrusted to Eaton, which I have acquired during said employment, whether or not developed by me.