CONDON AUTO SALES & SERVICE, INC., Condon Ford, Inc., and Condon Leasing Co., Appellees,

v.

William CRICK a/k/a Bill Crick, Appellant,

Wisner's Auto World, Defendant/Cross–Appellee.

William Crick a/k/a Bill Crick, Counterclaimant/Third–Party Plaintiff,

v.

Condon Auto Sales & Service, Inc., Condon Ford, Inc., and Condon Leasing Co., Third–Party Defendants.

No. 97–2229.

Supreme Court of Iowa.

Dec. 22, 1999.

As Amended on Denial of Rehearing Feb. 4, 2000.

Rehearing Denied March 13, 2000.[†]

† LARSON, J., taking no part.

Steven R. Jensen of Crary, Huff, Inkster, Hecht & Sheehan, P.C., Sioux City, for appellant and cross-appellee.

David L. Reinschmidt of Munger & Reinschmidt, Sioux City, for appellees.

Considered by CARTER, P.J., and LAVORATO, SNELL, CADY, and SCHULTZ,* JJ.

CADY, Justice.

This is an appeal and cross-appeal from a judgment entered by the district court following jury trial in a dispute between an employer and employee involving multiple claims, counterclaims, and a cross-claim. On our review, we affirm in part, reverse in part, and remand.

## I. Background Facts and Proceedings.

Condon Leasing Company is a closely-held family corporation in Sioux City. It is owned by seven members of the Condon family, and is the parent corporation of two other corporations, Condon Auto Sales & Service, Inc. and Condon Ford, Inc.[1]

Condon Auto is an automobile dealership in Sioux City which sells Buick, Honda, and Isuzu vehicles. Condon Ford is an automobile dealership in Moville which sells Ford vehicles. Steve Condon is the president of Condon Ford, general manager of Condon Auto, and president of Condon Leasing. Mark Condon is the vice president of Condon Ford, president of Condon Auto, and general sales manager of both Condon Auto and Condon Ford.

Bill Crick was hired as the used car sales manager for Condon Auto in March 1995. Crick had previously worked for other car dealerships in Sioux City, including Wisner's Auto World, Inc., and was employed by a dealership in Kentucky just prior to his employment with Condon Auto.

Crick was paid a salary based upon a percentage of the total profit of the dealership, but received a monthly draw of $8500. Profits were then calculated quarterly and compared with his monthly draws. The written employment contract provided:

> On April 15, July 15, Oct. 15, and Jan. 15 the quarterly earnings less draw will be paid. In the unlikely event that the draws for a given quarter exceed earnings, then the deficit will be rolled to the following quarter.

The "unlikely event" described in the employment contract was the norm while Crick was employed at Condon Auto. The business profits were insufficient to support the $8500 monthly draws. On four occasions, Steve Condon mentioned the deficit to Crick and suggested a portion of his monthly draw be applied to pay the deficit. Crick was also made aware of the growing deficit from Kevin Welte, the Chief Financial Officer of the Condon companies, following three separate quarterly financial reports. Crick assured Steve Condon that profits would increase and there was no need to reduce his draw.

In September 1995, Crick transferred to Condon Ford in Moville. Crick became the sales manager at the dealership. This was done at the request of Steve Condon. At the time Crick left Condon Auto, he had accumulated a deficit of $14,869.64 in unearned draws.

At Condon Ford, Crick was paid a straight salary of $8500 per month, which was to be replaced with a commission plan

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

1. We refer to Condon Leasing Company as "Condon Leasing," Condon Auto Sales & Service, Inc. as "Condon Auto," and Condon Ford, Inc., as "Condon Ford." We will collectively refer to the entities as "Condon" when the claims or issues presented apply to more than one.

at some point in the future. Like the prior agreement, there is no specified length of employment.

On March 20, 1996, Crick abruptly left Condon Ford and began working for Wisner's as the general sales manager. At the time, Crick was owed salary in the amount of $5525, constituting pay for one full pay period and a portion of a second pay period. Condon Ford withheld this money to offset the profit-draw deficit Crick accumulated while he was employed at Condon Auto.

While working for Condon Ford, Crick was in charge of purchasing used cars at dealer auctions for resale. He attended numerous auctions. It was common for sellers at the auctions to offer incentives to induce buyers to purchase certain vehicles. One seller, Alamo Rental Cars, offered buyers either $100 cash or forty-five days free financing for each car purchased from them. On two separate occasions, Crick accepted cash for purchasing cars from Alamo. On the first occasion, he received $600 for purchasing six cars. On the second occasion, he accepted $100 for purchasing one car. Crick did not turn this money over to Condon Ford.

In the final months before Crick left Condon Ford for Wisner's he began working on several outside businesses. He was involved in selling long distance service through Excel Telecommunications, selling radio advertisements to other car dealerships around the country, and was preparing to start a management company for local car dealerships. Additionally, Crick had frequent conversations during working hours with Nick Stamoulis, a friend and former assistant manager at Condon Ford. Stamoulis was the general sales manager at Wisner's. There was evidence suggesting Crick assisted Stamoulis in selling cars during these conversations by giving him advice on financing and closing car deals. Condon Ford believed Crick neglected his duties as sales manager by pursuing these activities.

Condon Ford made a profit for each month Crick was employed as the sales manager. The dealership sold 127 cars during the last quarter of 1995, and seventy-four cars during the first quarter of 1996. It was not unusual for car sales to be slow during the first quarter of each year. However, the average profit on the sale of used cars dropped from $1359.62 during the last quarter of 1995 to $1023.92 during the first quarter of 1996. Additionally, the average loss incurred by the dealership on wholesale transfers (selling cars at the auction) rose from a loss of $57.82 per car during the last quarter of 1995 to a $251.34 per car loss in the first quarter of 1996.

Condon instituted this action against Crick. It claimed Crick's conduct in the last months of his employment not only constituted a breach of a duty of loyalty implied in his employment contract with Condon Ford, but also a breach of his duty of good faith and fair dealing, and a breach of a duty of loyalty independent of the contract. Condon further claimed Crick breached his employment contract with Condon Auto by failing to reimburse Condon Auto for the overpaid draws in the amount of $14,869.64. Condon additionally claimed Crick converted $700. Condon also initiated an action against Wisner's, claiming Wisner's intentionally interfered with its contract with Crick.

Crick filed a counterclaim against Condon Leasing and Condon Ford, claiming it withheld wages owed to him in the amount of $5525 in violation of Iowa Code chapter 91A. He also claimed he was owed an additional two percent of the profits.

Prior to trial, the district court granted summary judgment for Crick on the breach of loyalty contract claim and breach of good faith and fair dealing claim. This left Condon with the tort claims of breach of loyalty and conversion as well as the reimbursement and interference contract claims. At trial, the district court granted a directed verdict for Wisner's on the intentional interference with contract claim.

It also directed a verdict for Crick on the breach of duty of loyalty claim. However, the court allowed Condon to amend its petition to reinstate the breach of contract claim based upon a breach of implied duty of loyalty.

The jury returned a verdict against Crick on the breach of loyalty contract claim in the sum of $25,000. It also awarded Condon Auto $9344.64 for overpaid draws ($14,869.64–$5525 withheld by Condon Ford). Additionally, it awarded Condon $700 for conversion, and $30,000 in punitive damages based upon the conversion. The jury found Crick's conduct was directed at Condon. The jury also found for Condon on Crick's claim for unpaid wages. The trial judge subsequently granted Crick's motion for judgment notwithstanding the verdict on the breach of loyalty contract claim. It reconsidered its prior ruling and concluded breach of loyalty was not recognized as a cause of action. It also concluded the evidence was insufficient to support any such claim and damages were too speculative. Crick appealed and Condon cross-appealed.

Crick claims the evidence was insufficient to support the verdict for conversion, breach of contract, and punitive damages. He also asserts he was entitled to judgment as a matter of law on his wage claim, and the trial court erred in instructing the jury on the wage claim.

Condon claims the trial court erred by directing a verdict on the claim for breach of loyalty and cross-claim for intentional interference with a contractual relationship. It also claims the court erred in granting a judgment notwithstanding the verdict on the contract claim for a breach of loyalty, and dismissing the tort claim of breach of loyalty.

## II. Scope of Review.

■ Our scope of review in an action at law is for correction of errors at law. *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 782 (Iowa 1985). In reviewing rulings on a motion for judgment notwithstanding the verdict, we determine whether there was substantial evidence to generate a jury question. *Lara v. Thomas*, 512 N.W.2d 777, 781 (Iowa 1994). Similarly, in reviewing a directed verdict, we determine whether a jury question was generated. *Fiala v. Rains*, 519 N.W.2d 386, 387 (Iowa 1994). Error in jury instructions is reversible only if the error is prejudicial. *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 287 (Iowa 1994).

■ Evidence is substantial to support a jury verdict if reasonable minds would find it adequate to reach the same conclusion. *Shams v. Carney*, 518 N.W.2d 366, 369 (Iowa 1994). In considering the sufficiency of evidence, we view the evidence in the light most favorable to the party in whose favor the verdict was rendered. *Id.*

## III. Crick's Claimed Errors.

## A. Conversion.

■ Crick first claims there was insufficient evidence as a matter of law to support the jury verdict against him for conversion of $700 from Condon Ford. He claims no conversion occurred because both parties had a good faith claim to the money offered by Alamo as an incentive to buyers.

■ Conversion is the wrongful control or dominion over another's property contrary to that person's possessory right to the property. *Ezzone v. Riccardi*, 525 N.W.2d 388, 396 (Iowa 1994). The wrongful control must amount to a serious interference with the other person's right to control the property. *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988) (citing Restatement (Second) of Torts § 222A(1) (1965)). Good faith by the defendant is a factor to consider in determining whether the interference amounts to conversion. *Id.* (quoting Restatement (Second) of Torts § 222A(2) (1965)).

Crick was employed by Condon Ford at the auctions and purchased vehicles on its behalf in the course of his employment. Moreover, a review of the incentive options offered by the sellers, cash or free financing, clearly indicated the incentives were for the dealership who ultimately purchased the car.

This evidence supports a finding by the jury that the retention of the money was in contravention to the possessory interest of Condon Ford. Thus, we affirm the district court's entry of judgment in the amount of $700 against Crick on the claim of conversion.

## B. Punitive Damages.

### 1. Insufficient Evidence to Support Verdict.

Crick also claims there was insufficient evidence to support the jury's punitive damage award of $30,000 for the act of conversion. The evidence to support a punitive damage award must be clear, convincing, and satisfactory. *See* Iowa Code § 668A.1(1)(a). There must also be evidence of willful and wanton disregard for the rights of another. *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 142 (Iowa 1996), *cert. denied*, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997).

Punitive damages are justified when the acts of the defendant are malicious. *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 167 (Iowa 1984). The malice may be "actual (expressed) . . . or it may be legal (implied), as where the defendant acts illegally or improperly with reckless disregard for another's rights." *Id.* (quoting *Freeman v. Bonnes Trucking, Inc.*, 337 N.W.2d 871, 879–80 (Iowa 1983)).

There was evidence in the case indicating that Crick had a duty to give the buyer incentive to Condon. There is also evidence he intentionally retained the money for his own benefit. This evidence would support a finding by a preponderance of clear, convincing, and satisfactory proof that Crick retained the money given to him by Alamo with a willful and wanton disregard for his employer's rights.

### 2. Failure to Grant New Trial or Enter Remittitur.

Crick further claims the district court erred in failing to grant a new trial or enter a remittitur based upon the excessiveness of the award. We address each separately.

### a. New Trial.

We review the denial of a motion for new trial for correction of errors at law. Iowa R.App.P. 4; *Johnson v. Knoxville Community Sch. Dist.*, 570 N.W.2d 633, 635 (Iowa 1997). However, if the motion is based on a discretionary ground, we review for abuse of discretion. *Johnson*, 570 N.W.2d at 635. A ruling on a motion for new trial following a jury verdict is a matter for the trial court's discretion. *Id.* In ruling upon such motions for new trial the trial court has a broad, but not unlimited, discretion in determining whether the verdict effectuates substantial justice between the parties. *See* Iowa R.App.P. 14(f)(3). The discretion must not be exercised arbitrarily and it must have some support in the record. *Wilson*, 558 N.W.2d at 144; *Riley v. Wilson Concrete Co.*, 184 N.W.2d 689, 690 (Iowa 1971). Generally, we are reluctant to interfere with a jury verdict and give considerable deference to a trial court's decision not to grant a new trial. *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 869 (Iowa 1994).

After a review of the record in this case, we find substantial evidence to support the jury's punitive damage award, and that substantial justice was served by the award. The district court did not abuse its discretion in denying Crick's motion and we affirm the punitive damage award against Crick in the amount of $30,000.

### b. Remittitur.

Crick also claims the district court erred in failing to enter a remittitur

on the jury's punitive damage award. Crick maintains the ratio between compensatory and punitive damage was excessive. We apply the following standard in considering remittitur:

> We will reduce or set aside a jury award only if it (1) is flagrantly excessive or inadequate; or (2) is so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is a result of passion, prejudice or other ulterior motive; or (4) is lacking in evidentiary support.

> The most important of the above enumerated tests is support in the evidence. If the verdict has support in the evidence the others will hardly arise, if it lacks support they all may arise.

*Tullis v. Merrill*, 584 N.W.2d 236, 241 (Iowa 1998) (quoting *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990)). If a verdict meets this standard or fails to do substantial justice between the parties, we must either grant a new trial or enter a remittitur. *Spaur*, 510 N.W.2d at 869.

 We have already found sufficient evidence supported the jury's punitive damage award, and that the district court's denial of Crick's motion for new trial was not an abuse of its discretion. The decision to deny remittitur was similarly within the discretion of the trial court. *See Burkis v. Contemporary Indus. Midwest Inc.*, 435 N.W.2d 397, 400 (Iowa App.1988).

 In *BMW of North America, Inc. v. Gore*, the Supreme Court refused to establish a mathematical formula, or a bright line test, to determine the constitutionality of a punitive damage award. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 585, 116 S.Ct. 1589, 1604, 134 L.Ed.2d 809, 833 (1996). Instead, the decision is made by considering factors such as 1) the reprehensibility of the conduct, 2) the profitability for the company in the conduct, 3) the impact of the judgment on the financial position of the party, 4) the expense of the litigation, 5) the lack of criminal charges filed against the party, and 6) the award

bore a "reasonable relationship" to "the harm that was likely to occur from [BMW's] conduct as well as … the harm that actually occurred." *BMW,* 517 U.S. at 566–67, 116 S.Ct. at 1594–95, 134 L.Ed.2d at 821 (quoting *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–24 (Ala. 1989)). These factors were previously approved of in *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045–46, 113 L.Ed.2d 1, 22 (1991). The Court adopted a "grossly excessive" standard, and found "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis … [but that a ratio of 500 to 1] must surely 'raise a suspicious judicial eyebrow.' " *Id.* at 583, 116 S.Ct. at 1603, 134 L.Ed.2d at 831 (quoting *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 481, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366, 394 (1993)).

We find that the ratio of actual damages to punitive damages in this case, nearly 43 to 1, falls within a constitutionally acceptable range based upon the reprehensibility of the act of converting money belonging to an employer, as well as the other relevant factors. As in the *Haslip* and *BMW* cases, we similarly refuse to draw concrete limits on the amount of punitive damage other than to emphasize that the punitive damage award in this case was not "grossly excessive."

We conclude the district court did not abuse its discretion in refusing to grant a remittitur. We affirm the district court's denial of Crick's motion for remittitur.

### C. Wage Payment Claim.

The wage claim by Crick is based in two parts. Crick claims Condon Ford withheld his final two paychecks totalling $5525. Additionally, he claims Condon failed to pay him a two percent bonus. Crick asserts he established both wage claims as a matter of law, and the trial court erred by instructing the jury he was required to prove Condon intentionally withheld the wages as a predicate to recovery. We

consider the wage claim involving the final two paychecks first.

Condon responds that the jury properly rejected the wage claim because Condon Leasing actually employed Crick and it had a valid wage dispute with Crick which allowed it to withhold Crick's wages at Condon Ford to offset the excessive draw he received while employed at Condon Auto. Furthermore, Condon argues any error in the jury instructions was harmless because the jury necessarily found it properly withheld the wages when it found in its favor on the separate breach of contract claim for nonpayment of the excessive draws.

### 1. Iowa's Wage Payment Collection Law.

The Iowa Wage Payment Collection Law requires employers to "pay all wages due its employees, less any lawful deduction" on designated regular intervals of time. Iowa Code § 91A.3(1) (1997). Additionally, when an employee is terminated, the employer is required to "pay all wages earned" less any lawful deductions within a specific period of time following the termination. *Id.* § 91A.4. Employers are permitted to make deductions from wages under two circumstances. The first pertains to deductions "required or permitted" to be deducted by state or federal law, or by a court order. *Id.* § 91A.5(1)(a). The second involves deductions pursuant to a written authorization from the employee. *Id.* § 91A.5(1)(b). In the event a dispute arises between an employer and employee over the amount of wages due, the employer is permitted to limit payment to "wages conceded to be due" less any authorized deduction. *Id.* § 91A.7.

An employer who fails to pay wages to an employee as required under the law is liable to the employee for the unpaid wages, court costs, and attorney fees incurred in the recovery of the unpaid wages. *Id.* § 91A.8. Additionally, an employer who intentionally fails to pay wages is liable for statutorily defined liquidated

damages. *Id.; see Audus v. Sabre Communications Corp.,* 554 N.W.2d 868, 874–75 (Iowa 1996) (attorney fees recoverable); *Jackson v. City of Ottumwa,* 396 N.W.2d 794, 796 (Iowa App.1986) (liquidated damage award). Liquidated damages are recoverable in an action for wages even if the intentional failure to pay wages resulted from a wage dispute. Iowa Code § 91A.8. Notwithstanding, an employer incurs no liability for withholding wages if the employer withholds the correct amount of wages. *See id.* The statute imposes liability only when the employer fails to pay the amount of wages actually due to the employee. *Id.*

It was undisputed in this case that Crick was not paid all his wages following his termination from employment at Condon Ford. The wages were withheld and applied to Crick's excessive draw. We therefore must first consider whether Condon's actions were permissible under the statute.

### 2. Nonpayment Due to Wage Dispute.

■ Condon argues it cannot be liable for damages for failing to pay wages to Crick because it had a legitimate dispute over the amount of wages due under section 91A.7. It claimed the dispute meant it was not required to pay any wages because it did not concede Crick was owed any wages. Moreover, Condon asserted it properly withheld the wages as confirmed by the jury verdict in its favor on the breach of contract claim against Crick for nonpayment of the excessive draw.

■ We acknowledge the jury found Crick was liable for the excessive draw. However, Condon's breach of contract claim for excessive draws did not constitute a "dispute ... concerning the amount of wages ... due" under section 91A.7. The purpose of the Wage Payment Collection Law is to facilitate collection of wages by employees. *Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 201 (Iowa 1997). Conversely, it does not exist to

assist in the collection of claims by the employer. *See* Iowa Code § 91A.5. The Act requires an employer to pay wages at regular intervals, and the amount of wages owed Crick for the last two pay periods was not disputed. Instead, the dispute in this case was over the excessive draws Crick owed Condon.

The purpose of the Act would be seriously undermined if an employer could generate a wage dispute under section 91A.7 and withhold an employee's undisputed wages by asserting a claim separate from its obligation to pay wages. Although Crick may have been responsible to Condon for the excessive draw, there was no evidence Crick was contractually bound to pay Condon for the excessive draw from his wages. In fact, Condon repeatedly requested Crick to allow a portion of the excessive draw to be deducted from his wages, but Crick refused. *See Halverson v. Lincoln Commodities, Inc.*, 297 N.W.2d 518, 521 (Iowa 1980) (evidence that employee admitted responsibility for the bad debt). Thus, there was no wage dispute which authorized Condon to hold back the wages.[2]

### 3. Deduction From Wages.

██ Condon further claims it could not be liable for damages because it was legally permitted to withhold the wages under section 91A.5(1) as a setoff against its claim for the excessive draw. The Act clearly allows the employer to deduct wages only when permitted by law, court order, or authorized by the employee. Iowa Code § 91A .5(1). Condon claims the law recognizes setoff as a mechanism to resolve competing disputes.

 There is no state or federal law which permits an employer to set off its claims against employees' wages. Moreover, the doctrine of setoff is an incident of a judicial proceeding, and is generally accomplished only by court action.

*See* 20 Am.Jur.2d *Counterclaim, Recoupment, Etc.* § 6, at 233 (1995); Iowa R.Civ.P. 225. It is not a unilateral procedure legally employed by a party to a dispute. *See Cameron v. Neon Sky, Inc.*, 41 Wash.App. 219, 703 P.2d 315, 317 (1985); *see also National Med. Care, Inc. v. Zigelbaum*, 18 Mass.App.Ct. 570, 468 N.E.2d 868, 874 (1984) (employer has no right to unilateral setoff); *P & L Group, Inc. v. Garfinkel*, 150 A.D.2d 663, 541 N.Y.S.2d 535, 537 (1989) (employer not entitled to self-help remedy of withholding money owed by employee). Furthermore, the restrictions on the deductions under section 91A.5 clearly illustrate an employer may not use wages as a basis for any self-help remedies in collecting an indebtedness. Section 91A.5(1) makes it unlawful to withhold any portion of the wages of an employee except under the two statutorily-described circumstances. *See Cameron*, 703 P.2d at 317 (interpreting wage payment collection statute similar to Iowa statute). None of the circumstances under the statute apply to the facts of this case, and Condon had no right to withhold the wages.

We conclude Condon violated the Wage Payment Collection Act by withholding Crick's wages at Condon Ford. Thus, Condon was liable as a matter of law to Crick for the unpaid wages, court costs, and attorney fees. The question turns to whether Condon was also liable as a matter of law for liquidated damages.

### 4. Liquidated Damages.

The Wage Payment Collection Act distinguishes between the intentional and unintentional failure to pay wages for the purpose of an award of liquidated damages. Iowa Code § 91A.8. Under the statute the intentional failure to pay wages, even if the result of a wage dispute, gives rise to liquidated damages. *Id.*

**2.** This conclusion makes it unnecessary to decide whether Crick was employed by Condon Leasing or Condon Ford for purposes of the wage claim. There was no wage dispute which would have permitted either entity to withhold wages.

■ We have not previously defined the type of intent to support liquidated damages, but have indicated liquidated damages are directed at employers who fail to pay wages knowing the wages are due. *Halverson,* 297 N.W.2d at 523. Conversely, liquidated damages are not available if an employer maintains a good faith dispute over the amount of wages. *Id.* Similarly, the intentional failure to pay wages excludes the inadvertent failure to pay. *Miller,* 356 N.W.2d at 216.

■ In this case Condon had no dispute with Crick over any portion of the wages due from the last two pay periods. It acknowledged the amount of these wages was $5525. Condon knew the wages were due and failed to pay them. Moreover, Condon cannot maintain or claim good faith. The dispute by Condon involved a separate claim for the excessive draw, but there was no dispute over the amount Condon owed. This constitutes the intentional failure to pay under the statute.

We find the trial court erred in failing to enter judgment for Crick on this portion of his wage claim. We therefore reverse that portion of the judgment and remand the case for entry of judgment for Crick for reasonable attorney fees attributable to his collection of wages owed, liquidated damages as defined by section 91A.2(6), and court costs. The amount of unpaid wages of $5525 were set off against Condon's judgment for the excessive draw, and must be excluded from the judgment for unpaid wages to avoid a duplication of damages.

### 5. Wage Claim Based on Failure to Pay Bonus.

■ The second wage claim by Crick was based upon the failure to pay a bonus of two percent. Condon maintained the bonus was only payable after Crick was employed for one year.

Unlike the first wage count claim, this claim involved a factual dispute. The jury found in favor of Condon. Normally, this would exonerate an employer from liability. However, the instructions submitted by the district court to the jury required Crick to prove Condon intentionally failed to pay the compensation. We have already indicated intent is only necessary to support the liquidated damage portion of the wage claim. Thus, the trial court erred by failing to distinguish between intentional and unintentional conduct. Moreover, based upon the instructions, we are unable to discern whether the jury found no bonus was due, or Condon did not intentionally fail to pay the bonus. Accordingly, we are required to reverse that portion of the judgment and remand the claim for a new trial on this issue.

### D. Verdict for Excessive Draw.

■ Crick asserts the verdict in the amount of $9344.64 for Condon based upon his breach of contract in failing to pay the excessive draw to Condon was not supported by substantial evidence. He argues the monthly draw should not have been deducted as an expense in determining the net profit. He further argues the draw was actually a salary and there was no agreement between the parties which required any repayment.

We find substantial evidence in the record to support the verdict. Although Crick presented evidence to support his argument, Condon also presented evidence to support the verdict.

### IV. Condon's Claimed Errors.

### A. Duty of Loyalty.

The trial court submitted Condon's claim for breach of loyalty under a contract theory. The jury returned a verdict in favor of Condon, but the trial court granted Crick's motion for judgment notwithstanding the verdict. It concluded there was no independent claim for breach of loyalty against an employee, and notwithstanding, it was not supported by sufficient evidence.

■ We recognize the existence of a common law duty of loyalty which is implied in employment relationships.

*Porth v. Iowa Dep't of Job Serv.*, 372 N.W.2d 269, 273–74 (Iowa 1985); *Gossard Co. v. Crosby*, 132 Iowa 155, 165, 109 N.W. 483, 487 (1906). This duty exists in at-will employment relationships, as well as contracts for a specific term. *See Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 788 (8th Cir.1996). Although at-will employment does not bind the parties to performance, the duty of loyalty attaches once performance commences and continues until it is terminated. *See Hunter v. Board of Trustees*, 481 N.W.2d 510, 513 (Iowa 1992) (at-will employment relationship does not bind parties to performance).

The duty of loyalty is not precisely defined, but has been applied on several occasions in the context of employee competition and self-dealing. *See Nelson v. Agro Globe Eng'g, Inc.*, 578 N.W.2d 659, 662 (Iowa 1998) (covenant not to compete is implied in every employment relationship); *Porth*, 372 N.W.2d at 273–74 (employee who solicits fellow employee to leave employer for competitor breaches duty of loyalty); *Gossard*, 132 Iowa at 165, 109 N.W. at 487 (as long as employee remains in employer's service, an implied undertaking ordinarily exists that the employee will not engage in any other service or business to the detriment of the employer's interest); *see also LaFontaine v. Developers & Builders, Inc.*, 261 Iowa 1177, 1187, 156 N.W.2d 651, 658 (1968) (servant must do nothing hostile to the master's interest). However, we have not previously considered whether the implied duty of loyalty gives rise to a separate cause of action for damages by an employer for breach of the duty by an employee.

 Ordinarily, breach of loyalty by an employee prompts the employer to discharge the employee from employment. Consequently, the issue is typically raised in response to claims by the employee based upon the discharge. *Porth*, 372 N.W.2d at 271–72 (raised in response to claim for unemployment benefits); *LaFontaine*, 261 Iowa at 1187, 156 N.W.2d at 658–59 (breach of employment contract without cause); *see also Stokes v. Dole Nut Co.*, 41 Cal.App.4th 285, 48 Cal. Rptr.2d 673, 681 (1995). On the other hand, claims by employers against employees for damages resulting from unfair competition and self-dealing are often brought as claims for breach of fiduciary duty. *See Kendall/Hunt Publ'g Co.*, 424 N.W.2d at 242–43; Restatement (Second) of Agency §§ 387–398 (1958). This is because a principal-agent relationship gives rise to a fiduciary duty of loyalty, and an employer-employee relationship can be closely associated with a principal-agent relationship. *See Kurth v. VanHorn*, 380 N.W.2d 693, 696 (Iowa 1986) (principal-agent relationship necessarily gives rise to a fiduciary duty); *Iowa Power & Light Co. v. Abild Constr. Co.*, 259 Iowa 314, 335, 144 N.W.2d 303, 315 (1966) (Iowa law recognizes a very fine line between agent and employee); *see also Kendall/Hunt Publ'g Co.*, 424 N.W.2d at 242–43 (employee found to have fiduciary duty); Restatement (Second) of Agency § 429 (1958) (agency's fiduciary duty of loyalty to principal is applicable to employment relationship). Thus, an employee can be held to the same fiduciary duties as an agent, subject to liability for breach of a fiduciary duty.

 On the other hand, an employee is not always an agent for the employer. *Hass v. Kaster*, 246 Iowa 48, 51, 66 N.W.2d 878, 880 (1954). A distinction is recognized between an agent and an employee, based largely on the degree and nature of service and control. *Abild*, 259 Iowa at 335, 144 N.W.2d at 315. An agent usually has greater authority to act for the principal, such as negotiating contracts, while an employee typically renders services at the direction of the employer. 27 Am.Jur.2d *Employment Relationship* § 3, at 555–56 (1996); *see also Merritt v. Huber*, 137 Iowa 135, 137, 114 N.W. 627, 627 (1908) (distinction between principal-agent and employer-employee is one of degree only). This heightened responsibility of an agent justifies the imposition of a fiduciary relationship. Likewise, employees· who as-

sume the same type of responsibility can become bound by a fiduciary duty. *See Kurth,* 380 N.W.2d at 696 (circumstances giving rise to fiduciary duty are diverse). Depending on the particular facts, some employees may be fiduciaries, while some may not.

In this case, Condon did not attempt to establish Crick as a fiduciary and assert a separate claim against Crick for a breach of fiduciary duty. Instead, the claim was based upon a breach of loyalty.

Some jurisdictions have refused to recognize a separate cause of action by an employer against an employee for breach of loyalty without an underlying fiduciary relationship between the employer and employee. *See Beverly Hills Concepts, Inc. v. Schatz & Schatz,* 247 Conn. 48, 717 A.2d 724, 729 (1998) (a breach of fiduciary duty implicates a duty of loyalty); *Physician Specialists v. Wildmon,* 238 Ga.App. 730, 521 S.E.2d 358 (1999) (cause of action against employee for breach of loyalty must be based upon a fiduciary duty). In these jurisdictions, a cause of action for breach of loyalty must be brought as a claim for breach of fiduciary duty. *See Eaton Corp. v. Giere,* 971 F.2d 136, 141 (8th Cir.1992); *Schatz,* 717 A.2d at 729; *Physician Specialists,* 521 S.E.2d at 362; *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 569–70 (1978); *Chelsea Indus., Inc. v. Gaffney,* 389 Mass. 1, 449 N.E.2d 320, 326 (1983).

 Other jurisdictions permit a separate claim for breach of loyalty, but recognize its close relationship to a breach of fiduciary duty. *Food Lion, Inc. v. Capital Cities,* 194 F.3d 505, 515–16 (4th Cir. 1999); *Vigoro,* 82 F.3d at 788; *Universal Elec. Corp. v. Golden Shield Corp.,* 316 F.2d 568, 573 (1st Cir.1963); *Stokes,* 48 Cal.Rptr.2d at 681; *Tech Plus, Inc. v. Ansel,* Civ. A. 96–01668–B, 1999 WL 482329 (Mass. March 22, 1999); *Dalton v. Camp,* 519 S.E.2d 82, 89 (N.C.Ct.App.1999); *Cameco, Inc. v. Gedicke,* 157 N.J. 504, 724 A.2d 783, 789 (1999). Thus, the scope of the duty of loyalty will vary with the na-

ture of the relationship. *Cameco,* 724 A.2d at 789. A higher duty of loyalty exists for employees who occupy a position of trust and confidence than those who occupy a low level task. *Id.; see also Tech Plus,* 1999 WL 482329 at *6; *Chelsea,* 449 N.E.2d at 326. Moreover, the duty of loyalty is generally confined to instances of direct competition, misappropriation of profits, property, or business opportunities, trade secrets and other confidences, and deliberately performing acts for the benefit of one employer which are adverse to another employer. *Food Lion,* 194 F.3d at 516. Inconsequential or indirect assistance or competition that is indirect or minimal is actionable only if the employee renders substantial assistance to the competitor. *Cameco,* 724 A.2d at 789.

Thus, even in those jurisdictions which recognize a cause of action for breach of loyalty, the action is limited in scope. A broad cause of action would give employers more protection than needed and could create an unfair advantage. It could also threaten an employee's bargaining power in the market. *See* Terry O'Neal, *Employees Duty of Loyalty & Corporate Constituency Debate,* 25 Conn.L.Rev. 681, 703 (1993).

Nevertheless, it is unnecessary for us to determine in this case whether a separate cause of action exists for breach of loyalty, either in tort or contract. Although Condon submitted substantial evidence to support unfair competition, self-dealing, and the enticement of employees to leave Condon, the evidence failed to show Condon was damaged by these activities.

 Instead, Condon's claim for damages was supported by evidence that the profit margin at the dealership decreased during the last few months of Crick's employment and for a period of time after his termination because Crick had paid too much for cars purchased at auctions and accepted as trade-ins, and did not diligently perform his other responsibilities as sales manager. The damage was not

based on Crick's competition with Condon, but his services performed for Condon. This activity falls outside the scope of any action for breach of loyalty. Therefore, the trial court properly concluded there was insufficient evidence to show the damages were a proximate cause of any breach of duty.

### B. Intentional Interference with Existing Contract.

■ Our law imposes tort liability on a person who intentionally and improperly interferes with the performance of a contract between another and a third person. *Financial Mktg. Serv., Inc. v. Hawkeye Bank & Trust,* 588 N.W.2d 450, 458 (Iowa 1999); *see also* Restatement (Second) of Torts § 766 (1979). An essential element of the tort is that the interference be intentional and improper. *Compiano v. Hawkeye Bank & Trust,* 588 N.W.2d 462, 464 (Iowa 1999). However, when the contract at issue in a claim for intentional interference is terminable at will, we require substantial evidence that the defendant's predominate or sole motive of the interference was to damage the plaintiff. *Id.*

■ We agree with the district court that there was insufficient evidence to establish any predominate or sole motive by Wisner's to damage Condon. Crick had a track record of moving from dealership to dealership, and even Condon hired Crick from a dealership in Kentucky. There was no substantial evidence to suggest a plan or motive by Wisner's at any level to cause financial harm to Condon, or undermine its business, by hiring Crick. The contact between Crick and Stamoulis may have been improper, but this evidence was insufficient to establish the necessary higher standard of proof for contracts terminable at will.

### V. Conclusion.

We affirm the district court in part and reverse in part. We remand the case to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**