# IN THE SUPREME COURT OF IOWA

No. 12–1862

Filed April 11, 2014

**STATE OF IOWA,**

    Appellee,

vs.

**PATRICK RYAN NICOLETTO,**

    Appellant.

---

Appeal from the Iowa District Court for Davis County, Myron L. Gookin, Judge.

A criminal defendant appeals his conviction for sexual exploitation by a school employee in violation of Iowa Code section 709.15. **REVERSED.**

John K. Rigg, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, until withdrawal, then Sheryl A. Soich, Assistant Attorneys General, Rick L. Lynch, County Attorney, for appellee.

**APPEL, Justice.**

A jury convicted the defendant, a worker at a local pipe manufacturer who coached high school basketball pursuant to a coaching authorization but was not a licensed teacher, of sexual exploitation by a school employee in violation of Iowa Code section 709.15(3)(*a*) and (5)(*a*) (2009). The sexual exploitation statute defines "school employee" as "a practitioner as defined in section 272.1." Iowa Code § 709.15(1)(*f*). Section 272.1 defines "practitioner" as "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." *Id.* § 272.1(7). The State prosecuted the defendant solely under the theory that he fell into the category of "other licensed professional" because he held a coaching authorization issued pursuant to Iowa Code section 272.31. Although a coach who holds a teaching or other professional license is clearly subject to the statute, a mere holder of a coaching authorization without a professional license within the meaning of section 272.1(7) does not fall under the sexual exploitation statute. Accordingly, we reverse the conviction and remand the case to the district court with instructions to dismiss the case.

### I. Background Facts and Prior Proceedings.

A reasonable jury could have found the following facts. Patrick Nicoletto worked as a night employee at a local pipe manufacturer. He also entered into contracts with the Davis County Community School District to be an assistant high school girls' basketball coach during the 2007 to 2008 and 2008 to 2009 school years. The first contract, dated August 29, 2007, stated Nicoletto's term as coach would commence November 5 of that year and include "90 days of service and such other

time as may be assigned to coach post-season tournaments or other related duties." The second contract, dated March 25, 2008, contained the same language, except it stated Nicoletto's coaching term would commence November 4 of that year. Under the contracts, the State paid Nicoletto $1940.40 per year. As a condition of payment for his coaching services, Nicoletto was contractually required to obtain either a teaching certificate with a coaching endorsement or a coaching authorization. Because he is not a teacher, Nicoletto obtained a coaching authorization. In addition to basketball, Nicoletto coached high school baseball for Davis County.

The Davis County high school basketball season generally lasts from November through the second week in February. During his first season, Nicoletto coached the freshman girls' basketball team and assisted with the varsity team. At some point during that season, S.L., a sixteen-year-old junior on the varsity team, began an exchange of text messages with Nicoletto. Though the messages were originally basketball related, they soon turned flirty and sexual in nature.

Sometime during 2008, Nicoletto invited S.L. to his house. While at first Nicoletto and S.L. engaged in physical intimacy short of sexual intercourse, they eventually engaged in sexual intercourse every week or two at Nicoletto's home.

Nicoletto and S.L. took steps to conceal their relationship. For instance, S.L. would park her vehicle behind Nicoletto's house or park at a nearby park and wait for Nicoletto to pick her up. S.L. often informed her parents she was staying at the homes of various friends. Other times, S.L. would spend the night at a motel owned by her aunt and uncle and Nicoletto would pick her up. The relationship continued throughout the summer, at times during which S.L. would participate in

organized basketball scrimmages against other high schools. Nicoletto was present at these scrimmages.

When S.L.'s senior year began in the fall, her school schedule did not require her to be at school until 10:00 a.m. In the mornings, S.L. would go to Nicoletto's house to meet him after he arrived home from work. At some point near the beginning of the fall semester, the school principal became concerned about the possible relationship between Nicoletto and S.L. and telephoned Nicoletto to ask about it. Several weeks later, the principal called S.L. into his office to discuss the matter. S.L. denied existence of the relationship. Nicoletto ended the relationship with S.L. in mid-September.

When the new basketball season started, S.L. and Nicoletto discussed how to keep their relationship from the rest of the team. By January or February 2009, S.L. learned Nicoletto was experiencing relationship difficulties with another woman whom he was dating at the time. Nicoletto had also moved by this time, and when S.L. went to see his new house, they engaged in intimacy, which may have included intercourse, once more.

The State charged Nicoletto with sexual exploitation by a school employee in violation of Iowa Code section 709.15(3)(*a*) and (5)(*a*). A jury found Nicoletto guilty. The district court sentenced him to five years imprisonment plus a ten-year special sentence under Iowa Code section 903B.2. Nicoletto timely filed an appeal, which this court retained.

**II. Issues.**

On appeal, Nicoletto raises a number of challenges. Among other things, Nicoletto argues that because he was not a school employee as that term is used under Iowa Code section 709.15(3)(*a*), he was not subject to criminal prosecution under this statute. Because the question

of whether Nicoletto was subject to prosecution under section 709.15(3)(*a*) is dispositive, we need not reach the other issues.

### III. Scope of Review.

We review issues of statutory interpretation and application for correction of errors at law. *E.g., State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013); *State v. Gonzalez*, 718 N.W.2d 304, 307 (Iowa 2006); *State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000).

### IV. Discussion.

**A. Statutory Framework.** Section 709.15(3)(*a*) prohibits "[s]exual exploitation by a school employee." "Sexual exploitation" occurs when a school employee engages in "[a]ny sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student." Iowa Code § 709.15(3)(*b*).

The sexual exploitation statute does not contain a definition of "school employee." Instead, the sexual exploitation statute provides that " 'school employee' means a practitioner as defined in section 272.1." *Id.* § 709.15(1)(*f*) (emphasis omitted). Accordingly, to understand who is a school employee subject to the criminal prohibitions of the sexual exploitation statute, we must refer to another chapter of the Code.

Iowa Code chapter 272 pertains to the board of educational examiners. Section 272.1, which is incorporated into the criminal statute under which Nicoletto was prosecuted, defines "practitioner" as "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." *Id.* § 272.1(7).

The State concedes Nicoletto was not an administrator, teacher, or holder of a statement of professional recognition. It claims, however, Nicoletto was an "other licensed professional" under section 272.1(7).

Section 272.1 does not define "other licensed professional," but it does define "license":

> "*License*" means the authority that is given to allow a person to legally serve as a practitioner, a school, an institution, or a course of study to legally offer professional development programs, other than those programs offered by practitioner preparation schools, institutions, courses of study, or area education agencies. A license is the exclusive authority to perform these functions.

*Id.* § 272.1(5).

Section 272.2 creates the board of examiners and grants it exclusive authority to license practitioners and establish licensing criteria. *Id.* § 272.2(1). Section 272.7 relates to the validity of the licenses. *Id.* § 272.7. Section 272.31 separately sets forth the requirements to obtain a coaching authorization. *Id.* § 272.31(1).[1]

**B. Positions of the Parties.**

1. *The State.* The State centers its claim that Nicoletto is a licensed professional on definitions of "license" and "professional." The State points to the definition of "license" in Iowa Code section 272.1(5) (2009) as well as Iowa Code section 272.7, which provides in part that "[a] person employed as a practitioner shall hold a valid license with an endorsement for the type of service for which the person is employed." Under these two provisions, the State argues, a coaching authorization functions as a license because a person who is not a teacher cannot be employed as the coach of an interscholastic athletic activity unless he or

---

[1]The legislature has amended chapter 272 in several ways since 2009. Section 272.2(1) now provides, in addition to the board of education examiners' authority to license practitioners, that the board has exclusive authority to "[p]rovide annually to any person who holds a *license*, certificate, *authorization*, or statement of recognition issued by the board, training relating to the knowledge and understanding of the board's code of professional conduct and ethics." Iowa Code § 272.2(1)(*b*) (2013) (emphasis added). Section 272.31 now provides for authorizations for both coaches and school business officials. *See id.* § 272.31(1)–(3).

she possesses an authorization. The State notes the school district required Nicoletto to prove he possessed a coaching authorization as a condition of his employment. Relying on the definitional language of section 272.1(5), the State further remarks that Nicoletto's authorization was the exclusive authority to act in the capacity as a coach because he could not be a part-time paid coach without one.

The State then points to a dictionary's definition of "professional" as "one with sufficient authority of practical experience in an area of knowledge or endeavor to resemble a professional." *See Webster's Third New International Dictionary* 1811 (unabr. ed. 2002) [hereinafter *Webster's*]. The State argues one who holds a coaching authorization is a professional under this definition because he or she is authorized to act in a capacity regulated by statute and must have successfully completed certain courses. The State also maintains the holder of a coaching authorization must complete special training on topics not within the scope of common knowledge, which qualifies the holder of a coaching authorization as a professional.

As to the requirement of section 272.1(7) that the violator be someone who provides "educational assistance to students," the State contends the scope of the statute is broad enough to encompass Nicoletto's coaching activities. The State suggests the statute covers many people who do not engage in classroom teaching activities, such as administrators, school service personnel, superintendents, athletic trainers, and counselors. For further support, the State cites *State v. Romer,* 832 N.W.2d 169, 177 (Iowa 2013), in which we stated it would be "illogical . . . to conclude the legislature intended to require an existing teacher–student relationship in order for a school employee to violate this Code section."

The State then connects the dots, arguing that because Nicoletto is a licensed professional and therefore a practitioner under section 272.1(7), it follows that he is a school employee subject to prosecution under section 709.15(3). To hold otherwise, the State claims, would defeat our recent declaration in *Romer* that "the legislature's clear intent [in enacting section 709.15(3)] was to protect students from exploitation by school employees." 832 N.W.2d at 181.

2. *Nicoletto.* Nicoletto generally argues he is not a licensed professional within the meaning of the statute. He contends that not every person employed by a school district is subject to prosecution for sexual exploitation of a student under section 709.15. He acknowledges he was required to complete certain courses to obtain the coaching authorization, but argues the fact that these courses can be completed in as little as two weekends undermines any suggestion that a coach holding only a coaching authorization is a licensed professional. He notes Iowa Code chapter 272C provides a laundry list of licensed professionals and the position of coach is not among them.

Nicoletto also maintains the legislature has recognized the difference between those holding coaching authorizations and those who are licensed school employees. In particular, Nicoletto points to section 232.69(1)(*b*)(4), which separately lists licensed school employees and holders of coaching authorizations as mandatory reporters of child abuse. Thus, Nicoletto contends that to construe "other licensed professionals" as used in section 272.1(7) to include holders of coaching authorizations would render superfluous references to both types of persons in other parts of the Code, such as the mandatory reporting statute.

Nicoletto further notes the legislature has specifically regulated the activities of coaches in other parts of the Code, such as the prohibition on gambling on certain athletic events, *see* Iowa Code § 99B.12(1)(*f*), and the prohibition on bribing coaches to influence a game, *see id.* § 722.3(2). Accordingly, Nicoletto argues, because coaches are specifically referenced in other parts of the Code, the legislature's omission of coaches from the definition of practitioner was intentional, and therefore, coaches are not members of the list of persons subject to the sexual exploitation statute.

Turning to definitions of "license" and "professional," Nicoletto asserts that while the definition of license in section 272.1(5) contemplates a license as the exclusive authority to perform a certain function, a coaching authorization does not impart exclusive authority to coach interscholastic athletics upon its holder because persons can still perform the function of a coach on a volunteer basis without a coaching authorization. Nicoletto thus claims he does not hold a license because the ability to carry on the function of a coach does not depend upon it. Nicoletto questions why the legislature would exclude volunteer coaches from the purview of the sexual exploitation statute if it had intended the statute to cover coaches.

Further, like the State, Nicoletto provides definitions of professional, but focuses on those defining the word to refer to someone with specialized training after years of academic preparation, such as medicine or the law. Nicoletto cites thirty-two professions for which the legislature has established licensing boards, and he notes coaching is not among them. *See id.* § 272C.1(6).

Nicoletto points to the absurdities that could arise from the State's interpretation. If coaches are covered by the sexual exploitation statute, he notes, an eighteen-year-old assistant coach holding a coaching

authorization could be prosecuted for kissing an eighteen-year-old student even if the coach was also a student or had recently graduated from the school. He further notes the same eighteen-year-old coach would not be subject to criminal liability for the same conduct if he coached the same student in a local community league or if the eighteen-year-old coach was a volunteer.

Finally, Nicoletto generally argues a coach is not one who provides educational assistance to students. He argues the reason teachers must have a separate coaching endorsement is that interscholastic athletics are not part of the educational curriculum. Nicoletto cites Iowa Code section 256H.1(2)(*f*) (Supp. 2009) for the proposition that interscholastic athletics are extracurricular, voluntary activities sponsored by the school district.

**C. Discussion.** When interpreting a statute, we begin with the words used in the statute. *See, e.g., State v. Hearn*, 797 N.W.2d 577, 583 (Iowa 2011); *State v. Kidd*, 562 N.W.2d 764, 765 (Iowa 1997). " 'To ascertain the meaning of the statutory language, we consider the context of the provision at issue and strive to interpret it in a manner consistent with the statute as an integrated whole.' " *State v. Pickett*, 671 N.W.2d 866, 870 (Iowa 2003) (quoting *Griffin Pipe Prods. Co. v. Guarino*, 663 N.W.2d 862, 865 (Iowa 2003)). When the express terms of a statute are unambiguous, we may not search for meaning beyond those terms. *E.g., Hearn*, 797 N.W.2d at 583; *State v. Chang*, 587 N.W.2d 459, 461 (Iowa 1998). Thus we "may not extend, enlarge, or otherwise change the meaning of a statute" under the pretext of construction. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). "In the absence of a legislative definition, we give words their ordinary meaning." *Hearn*, 797 N.W.2d at 583; *see also State v. White*, 545 N.W.2d 552, 555

(Iowa 1996). Further, we strive to interpret statutes "consistently with other statutes concerning the same or a related subject." *Pickett*, 671 N.W.2d at 870. Moreover, we interpret statutes in a manner to avoid absurd results and to avoid rendering any part of an enactment superfluous. *Id.*

In this case, we are called upon to interpret a criminal statute. In interpreting a criminal statute, "provisions establishing the scope of criminal liability are to be strictly construed with doubts resolved therein in favor of the accused." *Hearn*, 797 N.W.2d at 583; *see also, e.g., State v. Allen*, 708 N.W.2d 361, 366 (Iowa 2006); *State v. Schultz*, 604 N.W.2d 60, 62 (Iowa 1999); *State v. Gorman*, 464 N.W.2d 122, 123 (Iowa 1990); *Knott v. Rawlings*, 250 Iowa 892, 895, 96 N.W.2d 900, 901 (1959).

Further, as recently noted by Justice Antonin Scalia, writing for the majority in *Burrage v. United States*, a case in which the Supreme Court strictly construed a federal statute to preclude imposition of a penalty enhancement, "[t]he role of [a court] is to apply the statute as it is written—even if we think some other approach might ' "accor[d] with good policy." ' " 571 U.S. ___, ___, 134 S. Ct. 881, 892, 187 L. Ed. 2d 715, 727–28 (2014) (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252, 116 S. Ct. 647, 656, 133 L. Ed. 2d 611, 628 (1996)); *see also id.* at ___, 134 S. Ct. at 892, 187 L. Ed. 2d at 728 (Ginsburg, J., concurring) (agreeing with the majority that " 'in the interpretation of a criminal statute subject to the rule of lenity,' where there is room for debate, one should not choose the construction 'that disfavors the defendant' " (quoting *id.* at ___, 134 S. Ct. at 891, 187 L. Ed. 2d at 726 (majority opinion))). We have repeatedly expressed a similar view. *See Anderson v. State*, 801 N.W.2d 1, 1 (Iowa 2011) (" 'Ours not to reason why, ours but to read, and apply.' " (quoting *Holland v. State*, 253 Iowa 1006, 1011, 115 N.W.2d 161, 164 (1962)));

*Gorman*, 464 N.W.2d at 123 ("We only concern ourselves with what the legislature said rather than what it should have said or might have said."); *State v. Wedelstedt*, 213 N.W.2d 652, 656–57 (Iowa 1973) ("It is not our function to rewrite the statute. If changes in the law are desirable from a policy, administrative, or practical standpoint, it is for the legislature to enact them, not for the court to incorporate them by interpretation." (Citations and internal quotation marks omitted.)).

Against the backdrop of these principles of statutory interpretation, we begin our analysis by considering the meaning of the term "licensed professional" and whether a person holding a coaching authorization falls within its meaning. We do not believe the ordinary meaning of the term "licensed professional" includes a person who merely holds a coaching authorization under Iowa Code section 272.31 (2009).

Persons holding coaching authorizations may be as young as eighteen, lack secondary education, have only a minimum of training, and often conduct their coaching as an avocation apart from their full-time jobs. To apply the term "licensed professional" to Nicoletto, who worked the night shift at a pipe manufacturer and received a very small stipend for his coaching services, would not comport with our longstanding rule of narrowly construing criminal statutes. *See, e.g., Hearn*, 797 N.W.2d at 583; *Allen*, 708 N.W.2d at 366; *Schultz*, 604 N.W.2d at 62. Under the State's interpretation, an eighteen-year-old who recently graduated from high school and who obtained a coaching authorization could be considered a licensed professional for being a paid assistant coach for a summer sport. We find this approach counterintuitive and doubt whether a part-time assistant coach would commonly be understood as a licensed professional. *See Black's Law*

*Dictionary* 1329 (9th ed. 2009) (defining "professional" as "[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency"); *Webster's* at 1811 (defining "profession" as "a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods, maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service" or "a principal calling, vocation, or employment" and defining "professional" as "one that engages in a particular pursuit, study, or science for gain or livelihood" or "one who belongs to one of the learned professions or is in an occupation requiring a high level of training and proficiency"); *American Heritage Dictionary* 989 (1985) (defining "profession" as "an occupation or vocation requiring training in the liberal arts or the sciences and advanced study in a specialized field" and defining "professional" as "[h]aving great skill or experience in a particular field or activity").

Our caselaw is generally consistent with the thrust of the dictionary definitions. In *State v. Winneshiek Co-op Burial Ass'n*, 237 Iowa 556, 561, 22 N.W.2d 800, 803 (1946), we held that for purposes of a licensing statute, there was a distinction between a license to engage in a "profession" and a license to engage in "trade or business." We concluded that undertakers were not professionals even though they were required to be registered by the board of health and pass an examination, and that instead undertakers engaged in a business. *Id.* at 561, 22 N.W.2d at 803–04. We observed the word profession implied "professed attainments in special knowledge, as distinguished from mere

skill." *Id.* at 561, 22 N.W.2d at 803 (internal quotation marks omitted). Similarly, in *Halverson v. Lincoln Commodities, Inc.*, 297 N.W.2d 518, 523 (Iowa 1980), we noted that a profession "requires more than mere training." We further noted that the word profession "presupposes special mental and other attainments, special discipline and a liberal education, or its equivalent" and that a profession primarily involved "furnishing for others a needed faculty which they cannot provide, at least as well, for themselves." *Id.* at 523. We think the definitions in the dictionaries and in our caselaw strongly suggest that one merely holding a coaching authorization should not be considered a licensed professional under Iowa Code section 272.1(7).

Aside from the broad definitional analysis, there is at least one more technical reason why a person holding a coaching authorization under section 272.31 should not be considered a licensed professional. While chapter 272 does not define the term "other licensed professional," it does provide a definition for "license." *See* Iowa Code § 272.1(5). As noted above, this definition defines a license as in terms of exclusivity: "A license is the exclusive authority to perform [the listed] functions." *Id.* Thus, by the plain terms of section 272.1(5), the grant of a license by the board of educational examiners confers *exclusive* legal authority to perform the *function* for which the license was issued. *See id.* But the *function* of coaching can be performed by persons without a coaching authorization, namely, by unpaid volunteers. As noted by the Iowa Administrative Code, the term "coach" includes an individual "with [a] coaching endorsement or authorization . . . employed by a school district under the provisions of an extracurricular athletic contract" as well as "an individual who instructs, diagnoses, prescribes, evaluates, assists, or directs student learning of an interscholastic athletic endeavor on a

voluntary basis." Iowa Admin. Code r. 281—36.1; *see also* Iowa Code § 279.19B(1) ("The board of directors of a school district may employ . . . for assistant coach of any interscholastic athletic activity, an individual who possesses a coaching authorization . . . ."). Thus, the administrative code contemplates paid and unpaid coaches. Because the function of coaching may be conducted by unpaid volunteers without coaching authorizations, the function of coaching is not within the exclusive domain of a holder of a coaching authorization. A coach therefore cannot be a license holder within the meaning of section 272.1(5).

More support for our conclusion may be found in the structure of relevant Code provisions that distinguish between licenses and authorizations. For example, the authority of the board of educational examiners over licensing is detailed in Iowa Code section 272.2, and the validity of those licenses is covered by section 272.7. The board's authority with respect to authorizations is covered by Iowa Code section 272.31. The separate treatment of licenses and authorizations suggests the legislature saw a difference in the terms. *See id.* §§ 272.2, .7, .31.

Other provisions of the Code related to sex abuse also distinguish between the holders of a license and the holders of an authorization. For instance, section 232.69(1)(*b*)(4) lists licensed school employees and holders of coaching authorizations separately as mandatory reporters of child abuse. *Id.* § 232.69(1)(*b*)(4). Similarly, section 272.15(1) requires school officials to report the "resignation of a person who holds a *license*, certificate, or *authorization* issued by the board" for certain misconduct, including sexual abuse. *Id.* § 272.15(1) (emphasis added); *see also* § 272.2(14)(*b*)(i). If an authorization was a license, the inclusion of holders of authorizations in these statutory provisions would be meaningless.

The Code further demonstrates the legislature knows how to establish a licensing regime for those involved in athletics if it chooses to do so. Athletic trainers are subject to licensing pursuant to Iowa Code chapter 152D. The chapter provides for licensing requirements, which include certain educational, examination, and fee requirements; the duties of a regulatory board; and procedures for suspending and revoking licenses. *See id.* §§ 152D.3 (licensing requirements), .5 (board duties), .6 (license suspension and revocation). Further, it is unlawful for a person to engage in the practice of athletic training without a license. *Id.* § 152D.7(2). The legislature has thus established an exclusive licensing regime for athletic trainers. It has not done so for coaches, but has instead established a separate track for authorizations.

In addition, we note that other jurisdictions find no trouble expressly drawing coaches within the scope of their sexual exploitation statutes. *See, e.g.*, Ala. Code 13A–6–80 (LexisNexis Supp. 2013) (defining "school employee" to include "a teacher, school administrator, student teacher, safety or resource officer, *coach*, and other school employee" (emphasis added)); La. Rev. Stat. Ann. § 14:81.4 (2012) (defining "educator" as "any administrator, *coach*, instructor, paraprofessional, student aide, teacher or teacher aide" (emphasis added)); N.C. Gen. Stat. Ann. § 14–27.7 (LexisNexis 2013) (specifically listing "teacher, school administrator, student teacher, school safety officer, or *coach*, . . . or . . . other school personnel" (emphasis added)); Ohio Rev. Code Ann. § 2907.03(A)(7)–(8) (LexisNexis 2010) (prohibiting sexual conduct between a student and "a teacher, administrator, *coach*, or other person in authority" employed by the school or institution of higher learning (emphasis added)); 18 Pa. Cons. Stat. Ann. § 3124.2(a.2)(2)(ii)(A)(II) (West Supp. 2013) (prohibiting conduct between volunteers or employees of

schools and students and defining "employee," in part, to include "[a]n independent contractor who has a contract with a school for the purpose of performing a service for the school, a *coach*, an athletic trainer, [and] a *coach* hired as an independent contractor by the Pennsylvania Interscholastic Athletic Association" (emphasis added)). Although each of these statutes use linguistic approaches different from Iowa Code section 709.15—we have not found a statute defining "school employee" or a similar term to include a "licensed professional" in this context—these statutes nonetheless demonstrate the ease with which legislators may draw coaches within the scope of a sexual exploitation statute.

Finally, our interpretation draws support from the legislative history of Iowa Code sections 272.31 and 709.15. As originally enacted in 1984, section 272.31, which was then located in chapter 260 along with the rest of the provisions governing the board of educational examiners, set forth the requirements to obtain a "coaching authorization." *See* 1984 Iowa Acts ch. 1296, § 3 (codified at Iowa Code § 260.31 (1985)). At the time, no provision in the chapter governing the board referenced licenses. Instead, for instance, teachers were required to hold valid certificates. *See* Iowa Code § 260.7 (1985). In 1989, the legislature amended the chapter to require licenses instead of certificates. *See* 1989 Iowa Acts ch. 265, § 2 (amending Iowa Code section 260.2 (1989) to govern the board's licensing authority). For example, the legislature now required teachers to hold licenses instead of certificates and put a provision in place governing the conversion of certificates to licenses. *See* 1989 Iowa Acts ch. 265, § 1 (amending Iowa Code section 260.1 to define "[t]eacher" as a "licensed member of a school's instructional staff"), § 7 (amending Iowa Code section 260.7 to govern the validity of licenses), § 9 (amending Iowa Code section 260.9 to

address the continuity of certificates and licenses and to provide for the conversion of certificates to licenses). That same year, the legislature amended section 260.31 to refer to "coaching *licenses.*" *See id.* §§ 15–16 (codified at Iowa Code § 260.31 (Supp. 1989)) (emphasis added). The next year, however, the legislature amended section 260.31 to restore the original language to once again set forth the requirements for a "coaching *authorization.*" *See* 1990 Iowa Acts ch. 1249, § 11 (codified at Iowa Code § 260.31 (1991)). This history reinforces our conclusion that the legislature deliberately chose to use the word "authorization" rather than "license" to describe what a coach must obtain under Iowa Code section 272.31.

Moreover, when the legislature enacted the sexual exploitation statute in 1991, it applied only to counselors and therapists. *See* 1991 Iowa Acts ch. 130, § 2 (codified at Iowa Code § 709.15 (Supp. 1991)). In 2003, the legislature enacted H.F. 549, which amended the sexual exploitation statute to include school employees and defined "school employee" using the same definition the statute employs today—a reference to the definition of practitioner in section 272.1. *See* 2003 Iowa Acts ch. 180, § 65 (codified at Iowa Code § 709.15 (Supp. 2003)). That same year, multiple Senate Files were introduced that would have brought coaches or those holding coaching authorizations into the sexual exploitation statute's definition of "school employee," but they were not enacted. *See* S.F. 44, 80th G.A., Reg. Sess. § 4 (Iowa 2003) (" 'School employee' means a teacher, employee, contract employee, *coach*, or *assistant coach* . . . ." (Emphasis added.)); S.F. 169, 80th G.A., Reg. Sess. § 5 (Iowa 2003) (" 'School employee' means a practitioner or para-educator as defined in section 272.1, or a person who holds a *coaching authorization* awarded pursuant to section 272.31." (Emphasis added.)).

We decline to add to the statute what the legislature itself declined to enact.

We emphasize that it is not the province of this court to speculate about probable legislative intent without regard to the wording of the statute, and any determination must be based upon what the legislature actually said rather than on what it might have said or should have said. *E.g., Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995). As we have traditionally and repeatedly stated, "We do not inquire what the legislature meant; we ask only what the statute means." *State v. Brustkern*, 170 N.W.2d 389, 392 (Iowa 1969) (citations and internal quotation marks omitted); *State v. Ricke*, 160 N.W.2d 499, 501 (Iowa 1968); *State v. Bishop*, 257 Iowa 336, 339–40, 132 N.W.2d 455, 457 (1965); *accord State v. Jennie Coulter Day Nursery*, 218 N.W.2d 579, 582 (Iowa 1974); *Kruck v. Needles*, 259 Iowa 470, 477, 144 N.W.2d 296, 301 (1966); *Lever Bros. Co. v. Erbe*, 249 Iowa 454, 469, 87 N.W.2d 469, 479 (1958); *In re Guardianship of Wiley*, 239 Iowa 1225, 1232, 34 N.W.2d 593, 596 (1948); Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). Policy arguments to amend statutes must be directed to the legislature. *In re Estate of Whalen*, 827 N.W.2d 184, 194 (Iowa 2013); *In re Estate of Myers*, 825 N.W.2d 1, 8 (Iowa 2012). These principles are not hypertechnical, but rather they are fundamental to the separation of powers and must be applied in a consistent fashion, across all spectrums of cases.

For the above reasons, we conclude a holder of a coaching authorization under Iowa Code section 272.31 is not a licensed professional under Iowa Code section 272.1(7). For us to reach the opposite conclusion, we would need to rewrite the statute and ignore the

legislature's choice to distinguish between licenses and authorizations. We decline to do so.

Our interpretation of section 709.15(3)(*a*) in *Romer* is not contrary to our interpretation today. In *Romer*, a teacher argued he could not be convicted of sexual exploitation by a school employee under section 709.15(3) because no direct teacher–student relationship existed between him and any of the students whom he was convicted of exploiting. 832 N.W.2d at 175. Unlike in the present case, because the defendant in *Romer* was a teacher, there was no question the defendant was at least the type of school employee that would be covered by the sexual exploitation statute. The issue instead involved the timing of the sexual relationship.

We found the legislature defined "school employee" broadly to encompass situations beyond those only involving a direct teacher– student relationship, such as those administrators and certain professionals, including para-educators. *Id.* at 177; *see also* Iowa Code § 272.1(6) (defining "para-educator" as "a person who is certified to assist a teacher in the performance of instructional tasks"). We then found section 709.15 criminalizes the exploitation of a power relationship *by those covered by the statute. Romer*, 832 N.W.2d at 177–78 ("It is the fact that Romer was a teacher and the victims were students, *as defined under the Code*, which makes the conduct a crime." (Emphasis added.)); *see also Romer*, 832 N.W.2d at 184–85 (Hecht, J., concurring in part and dissenting in part) (concluding a violation of section 709.15(3) requires an existing "school employee–student education-based relationship"). Accordingly, we held section 709.15(3)(*a*) does not require a contemporaneous teacher–student relationship. *Romer*, 832 N.W.2d at 178, 184 (majority opinion).

Whether and to what extent coaches who are not "licensed professionals" should be drawn into Iowa Code section 709.15 is a matter for the legislature. We conclude only that section 709.15 does not include coaches who hold only coaching authorizations because they do not amount to "licensed professionals" within the meaning of section 272.1(2). Because of the language of the relevant statutes, the structure of the statutes, and the relevant legislative history, we cannot through construction expand the scope of the statute to include them. *See Burrage*, 571 U.S. at ___, 134 S. Ct. at 892, 187 L. Ed. 2d at 727–28; *Anderson*, 801 N.W.2d at 1; *Hearn*, 797 N.W.2d at 583; *Allen*, 708 N.W.2d at 366; *Schultz*, 604 N.W.2d at 62; *Gorman*, 464 N.W.2d at 123; *Wedelstedt*, 213 N.W.2d at 656–57; *Rawlings*, 250 Iowa at 895, 96 N.W.2d at 901; *see also Auen*, 679 N.W.2d at 590.

## V. Conclusion.

Although a coach who holds a teaching or other professional license is clearly subject to prosecution under section 709.15(3), a person who coaches merely pursuant to a coaching authorization but who is not also a "licensed professional," "teacher," or "administrator" within the meaning of section 272.1(7) is not subject to prosecution under section 709.15(3). We therefore reverse the jury's verdict and remand the case for the district court to dismiss the charges against Nicoletto.

**REVERSED.**

All justices concur except Waterman and Mansfield, JJ., who dissent.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent because I conclude Ryan Nicoletto, the defendant basketball coach paid under a contract with the school district, was a "school employee" prohibited by Iowa Code section 709.15 (2009) from having sex with a student on his team. I would affirm his conviction. As the district court correctly stated, "To construe Section 709.15, The Code, to exclude a coach in a public school district would be contrary to the intent of the statute, and common sense." The majority's hypertechnical interpretation reaching the opposite conclusion opens a gaping loophole in that law, enacted to protect students from sexual exploitation by adults at their school. Today's decision no doubt will surprise school officials, parents, and coaches who had assumed the same law that made it illegal for a teacher to engage in sexual activity with students also applied to coaches. The ball is now in the legislature's court to amend section 709.15 to close this new loophole.

The majority's interpretation of section 709.15 fails to apply a fundamental rule of interpretation: "[S]tatutes are to be read so they make sense and achieve the legislature's purposes." *State v. DeSimone*, 839 N.W.2d 660, 667 (Iowa 2013). The legislature's purpose in enacting section 709.15 was to criminalize the exploitation of students by school employees in a power relationship over their victims. *State v. Romer*, 832 N.W.2d 169, 177–78 (Iowa 2013) ("[W]e have emphasized that it is exploitation of the power relationship that must be avoided."). Our court of appeals in *Romer* aptly observed, "Our legislature could well have concluded that a school employee has a higher calling or duty than an ordinary citizen to protect school-age children." *State v. Romer*, No. 11–0270, 2012 WL 3590725, at *4 (Iowa Ct. App. Aug. 22, 2012)

(unpublished opinion), *aff'd*, 832 N.W.2d 169 (Iowa 2013). Most parents would agree. I do.

Iowa legislators presumably understood there is a risk of sexual exploitation of student athletes by coaches that warrants at least the same statutory prohibitions that are applied to teachers and other school employees. I see no persuasive indication the legislature intended to exclude coaches from section 709.15.[2] Coaches, even more than classroom teachers, are in a power relationship over students, and those few who lack impulse control are well-positioned to take advantage. As the district court aptly concluded, "The statute prohibits adults in schools from abusing their position of trust and authority with students, for the purpose of gratifying their sexual desires. Certainly, the intent of the statute is to reach and include individuals in Nicoletto's position." Exactly right.

Anyone with experience in youth sports understands that student athletes generally are more vulnerable to exploitation by coaches than by classroom teachers or other school employees. The coach decides who makes the team, who plays, and who sits on the bench. College scholarship opportunities may hang in the balance. Practices are after school hours. Games are at night with travel to other towns. Tension

---

[2]The majority notes two proposed bills were introduced in 2003 that would have expressly named coaches as "school employees" subject to criminal liability for sexual exploitation. Instead of enacting either of these stand-alone bills, the general assembly adopted wide-ranging school legislation that, in one section, extended criminal liability to all "school employees" who are "licensed professionals." This legislative history is inconclusive. *See Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 146 n.3 (Iowa 2013) (concluding "[i]t is difficult to draw definitive conclusions from . . . legislative history" when multiple versions of a bill are in play). One could infer that the general assembly intended the final legislation to have the same coverage as the stand-alone bills. One could further infer that the legislature assumed it was unnecessary to name coaches in the final legislation because they were easily included under the definition of "licensed professional."

and emotional drama are inevitable. For obvious reasons, the training required to attain and renew coaching authorizations includes conduct advisories to avoid impropriety and the appearance of impropriety. *See generally* Iowa Admin. Code r. 282—22.1(2)(*a*)(5) (requiring five hours of coursework "relating to the knowledge and understanding of professional ethics and legal responsibilities of coaches" to earn coaching authorization). Nicoletto serves as an example of what can happen. Commentators agree:

> The sad truth is that sports provide the perfect opportunity for adults to sexually exploit children. Coaches are placed on a pedestal by parents and children. They work closely with youngsters, often away from other adults. In some cases they travel out of town together, often staying overnight. Parents have assumed that their child will be protected because there are other children around. Clearly this is not a guarantee.

Robert J. Shoop, *Sexual Exploitation in Schools: How to Spot It and Stop It* 32 (2004).

> Children in a coach-player relationship tend to be more susceptible to sexual assault for various reasons. Whenever there exists a parenting or nurturing environment, children are much more likely to consent to activities they usually would never undertake. Children look to coaches as role models, heroes, or even best friends; therefore, athletes almost always automatically trust them. Furthermore, from the earliest stages of athletics, children are taught to never argue with or disobey coaches.

Jamie Peterson, *"Don't Trust Me with Your Child": Non-Legal Precautions When the Law Cannot Prevent Sexual Exploitation in Youth Sports,* 5 Tex. Rev. Entm't & Sports L. 297, 299 (2004) (footnotes omitted).

The majority plays a linguistic shell game to get to its result. The majority concludes, erroneously, that a "coaching authorization" is not a "license" and a coach is not a "licensed professional." A "coaching authorization" is simply a form of "license." I disagree with the majority's

conclusion that a paid sports coach is not a "professional." Common definitions of "professional" plainly include trained coaches paid to do their job. We use the word "professional" to distinguish a paid employee from a volunteer or amateur. *See Webster's Seventh New Collegiate Dictionary* 680 (1972) (defining "professional" as "participating for gain or livelihood in an activity or field of endeavor often engaged in by amateurs"; "engaged in by people receiving financial return"; "one that engages in a pursuit or activity professionally"); *Webster's Third New International Dictionary* 1811 (unabr. ed. 2002) (defining "professional" as "one with sufficient authority or practical experience in an area of knowledge or endeavor to resemble a professional"). You can hire a professional painter to touch up your living room ceiling or do it yourself. The painter does not need a doctorate to be a professional. There is no contextual indication the legislature intended a narrow definition for "licensed professional" in section 709.15 limited to the learned professions requiring advanced degrees. I would affirm the rulings by two district court judges[3] that Coach Nicoletto was a "licensed professional" within the meaning of section 709.15.

The majority's effort to distinguish a "coaching authorization" from a "license" is unpersuasive. Iowa Code section 709.15(1)(*f*) defines "school employee" to mean "a practitioner as defined in section 272.1," which in turn defines "practitioner" as follows:

---

[3]The first district court judge denied Nicoletto's motion to dismiss in a thorough, well-reasoned ruling filed July 6, 2012, that carefully addressed the interrelated statutory provisions in concluding a coach is a licensed professional subject to the criminal prohibitions of Iowa Code section 709.15. Another judge presided over the trial and reached the same conclusion in a separate, well-reasoned ruling on Nicoletto's posttrial motions.

> "Practitioner" means an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students.

Iowa Code § 272.1(7) (emphasis omitted). The fighting issue in this case is whether a coach is a "licensed professional." Section 272.1 defines "license" as follows:

> "License" means the authority that is given to allow a person to legally serve as a practitioner, a school, an institution, or a course of study to legally offer professional development programs, other than those programs offered by practitioner preparation schools, institutions, courses of study, or area education agencies. A license is the exclusive authority to perform these functions.

Iowa Code § 272.1(5) (emphasis omitted).

Separately, a person who does not have a teaching license must obtain a "coaching authorization" to serve as a paid coach in an Iowa public school. *See* Iowa Admin. Code r. 282—22.1 ("A coaching authorization allows an individual to coach any sport in a middle school, junior high school, or high school."); *see also* Iowa Admin. Code r. 282—13.28(29)(*b*) (stating requirements to receive an "Athletic coach" teaching endorsement). As the district court recognized, that coaching authorization is what authorizes the coach to serve as a coach—which equates to a license. A coaching authorization is simply a form of a license. Many coaches have a teaching license. Under the majority's interpretation, section 709.15 criminalizes a paid coach's sexual activity with a student if the coach has a teaching license, but not if, like Nicoletto, the coach has only the coaching authorization. That makes no sense.

Significantly, the legislature treats authorizations the same as licenses throughout chapter 272, so why treat them any differently in this context? For example, Iowa Code section 272.2(1)(*b*) (2013) charges

the board with "[p]rovid[ing] annually to any person who holds a license, certificate, authorization, or statement of recognition issued by the board, training relating to the knowledge and understanding of the board's code of professional conduct and ethics." Iowa Code section 232.69(1)(*b*)(4) (2009) lists both licensed school employees and holders of coaching authorizations as mandatory reporters of child abuse. Iowa Code section 272.15(1)(*a*)(2) (2013) requires school officials to report disciplinary action against "a person who holds a license, certificate, or authorization issued by the board" for the same conduct.

As the majority acknowledges, coaches like Nicoletto are mandatory reporters of child abuse, including improper sexual contact. Iowa Code § 232.69(1)(*b*)(4) (2009). Yet, now, under the majority's interpretation of section 709.15, Nicoletto may lawfully have consensual sex with sixteen-year-old girls[4] he coaches—conduct that would land their classroom teacher in prison. He would be legally obligated to report a teacher who did what he did, but not himself. This is absurd. The majority thereby disregards yet another rule Iowa courts are to follow: "We seek to 'avoid strained, impractical, or absurd results' in interpreting statutes." *Rivera v. Woodward Res. Ctr.,* 830 N.W.2d 724, 733 (Iowa 2013).

I would not give a pass to Coach Nicoletto, who at the time of his misconduct at issue was thirty years old, with a college degree and a decade of coaching experience. He is fourteen years older than his

---

[4]It is a separate crime, commonly known as statutory rape, for an adult to have sex with a fourteen or fifteen year old if the adult is four or more years older than the minor. Iowa Code Ann. § 709.4(1)(*b*)(3)(d) (West, Westlaw current through immediately effective legislation signed as of April 4, 2014) (with exception for those cohabitating at the time as husband and wife); *see also id.* § 709.4(1)(*b*)(2) (criminalizing sex act with child age thirteen or younger by any person not cohabitating at the time as husband and wife); *id.* § 709.3(1)(*b*) (criminalizing sex act with person under the age of twelve).

victim. He began having sex with the victim when she was age sixteen, a junior in high school, and playing on the girls' varsity basketball team he was paid to coach. She became enamored with her coach during the varsity season and initiated their relationship through text messages that hinted she "liked him." He balked at first, texting back that "it sounded dangerous and he wasn't sure he could trust [her]." She responded that she "was very trustworthy and he could trust" her. Their texts escalated into sexual banter. He invited her to his house in March of 2008, late in the basketball season. She went there alone, unsure what would happen. By April, they were having sex, and she was spending nights at his home, telling her parents that she was staying at a friend's house. The relationship extended into the summer, as Nicoletto continued to coach the basketball team in off-season scrimmages and practices. Their clandestine sexual liaison continued into the fall semester and spanned two basketball seasons. Nicoletto has never claimed he believed Iowa law permitted him to sleep with a girl he coached.

Nicoletto obviously had "fair warning" that sleeping with a student was wrong—he acknowledged as much and went to great lengths to keep his relationship with the victim secret. *See Crandon v. United States*, 494 U.S. 152, 160, 110 S. Ct. 997, 1002, 108 L. Ed. 2d 132, 141 (1990) ("[C]onstruction of a criminal statute must be guided by the need for fair warning . . . .").[5] He told her never to phone him because he did not

---

[5]The majority understandably does not rely on the rule of lenity. *See United States v. Castleman*, ___ U.S. ___, ___, 134 S. Ct. 1405, 1416, 188 L. Ed. 2d 426, ___ (2014) (citing *Crandon* and noting " 'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended' " (quoting *Barber v. Thomas*, 560 U.S. 474, 488, 130 S. Ct. 2499, 2508, 177 L. Ed. 2d 1, 12 (2010))). *But see State v. Copenhaver*, 844 N.W.2d 442, 453 n.4 (Iowa 2014) (Mansfield, J., dissenting) (questioning whether the rule of lenity in Iowa is limited "to situations where there was grievous ambiguity in a statute and no [other] basis for

want her number on his phone bills. Yet, they exchanged thousands of text messages, ninety-one in one day. He warned her never to tell anyone about their relationship. He got very angry when she told a friend. Nicoletto told the victim that his family "would disown him" if they knew what he was doing. He ended their relationship only because a suspicious principal began asking them both questions. He had sex with the victim the morning he ended their relationship. When Nicoletto later tearfully confessed to his adult girlfriend, he asked if she "thought he was a pedophile." After the relationship ended, Nicoletto "wouldn't even look at [the victim] at practice." When confronted by her mother and later the police, the victim initially denied any relationship with Nicoletto and later came clean. She testified at his jury trial. The jury found him guilty.

For those reasons, I would affirm the district court's rulings that Nicoletto's misconduct is criminal under Iowa Code section 709.15.

Mansfield, J., joins this dissent.

---

choosing among plausible interpretations of a statute" (internal quotation marks omitted)).