**IN THE COURT OF APPEALS OF IOWA**

No. 14-1431
Filed October 14, 2015

KEVIN PRUISNER,
        Plaintiff-Appellee,

vs.

RODNEY BALLHAGEN,
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Butler County, Colleen D. Weiland,

Judge.


        A defendant appeals the court's decision finding that he converted the

plaintiff's hogs.  **AFFIRMED.**



        Gary R. Papenheim of Papenheim Law Office, Parkersburg, for appellant.

        Andrew B. Howie and Michael P. Mallaney of Hudson, Mallaney, Shindler

& Anderson, P.C., West Des Moines, for appellee.



        Heard by Doyle, P.J., Bower, J., and Eisenhauer S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**EISENHAUER, Senior Judge.**

Rodney Ballhagen appeals from the district court's August 4, 2014 ruling finding he converted hogs owned by Kevin Pruisner. Ballhagen claims Pruisner failed to prove he owned the hogs Ballhagen sold to a packing company. He also claims the court erred in admitting into evidence certain exhibits Ballhagen claims contain inadmissible hearsay. Upon our review of the record, we conclude substantial evidence supports the district court's liability finding, and we find no error in the court admitting the exhibits in question because they fall within the business records hearsay exception.

**I. Background Facts and Proceedings.**

Starting in August 2005, Pruisner and Ballhagen entered into a contract[1] for Pruisner to deliver to Ballhagen SEW[2] and feeder[3] pigs on a routine basis.[4] Under the terms of the contract, Pruisner paid for the feed, transportation, and veterinary services and medication for the hogs, and Ballhagen provided daily care until the hogs reached market weight. Pruisner paid Ballhagen a monthly fee based on the total number of hog spaces available at Ballhagen's facility, but Pruisner retained ownership interest in the hogs. Ballhagen kept an inventory of the hogs at the facility, and hogs not accounted for by the inventories and death loss reports would be charged against Ballhagen's next monthly payment.[5]

---

[1] In the beginning, the working arrangement was governed by an oral agreement. Later, it was memorialized by a written contact signed in April 2006.

[2] SEW means "segregated early wean," and at this stage, the pigs weigh between eight and fifteen pounds.

[3] Feeder pigs are larger than SEW pigs, weighing between forty and eighty pounds.

[4] The written contract called for approximately 2100 pigs to be delivered about every nine weeks, weighing approximately 11 pounds.

[5] While this provision providing a penalty for missing hogs was in the contract, Pruisner never sought to enforce the penalty against Ballhagen.

Ballhagen was also restricted from keeping other hogs at the facilities unless approved by Pruisner. When the hogs reached market weight, approximately six months after being delivered to the facility as SEW pigs, Pruisner arranged to have a truck transport the fattened hogs to market. Pruisner received a verbal headcount and average weight report from the trucker. He later received a written report and a check for the slaughtered hogs from the meatpacker.

The person in charge of providing the feed for the hogs, Steve Albers, alerted Pruisner sometime in 2007 that the inventory counts were not matching up and there may be some missing hogs. When asked about the discrepancy, Ballhagen said the miscount was the result of hogs who were slow in gaining weight being put in a "slush pen" when the rest of that group of hogs went to market. Those hogs in the slush pen were held back until they achieved market weight and then sent to market with the next load of hogs. There was no inventory report kept of the hogs in the slush pen nor could anyone tell which group the hogs in the slush pen came from as they were not otherwise marked. Albers and Pruisner accepted this explanation and continued the contract until 2008.

Pruisner filed for bankruptcy in April 2008, and in the course of the continuing investigation into the missing hogs, Pruisner contacted the hog buyer at the Marble Rock station, Robert Wirtz. Wirtz told Pruisner that Ballhagen had sold hogs to him over the past several years. The records from the Marble Rock station indicated Ballhagen had sold 2864 hogs to Wirtz during the time Ballhagen was caring for Pruisner's hogs, between January 2006 and June 2008. Based on the records he maintained, Pruisner could not account for 3068 of the

nearly 30,000 hogs that had passed through Ballhagen's facility during that time period.[6]

Ballhagen asserted the hogs he sold at Marble Rock during this time period were hogs he owned and raised on his father's farm, not hogs belonging to Pruisner. During the bankruptcy proceedings, and criminal investigation, Ballhagen was asked to provide records demonstrating his ownership interest in the hogs sold at the Marble Rock station, such as documents indicating when and where the hogs were purchased, the feed or veterinarian records for the hogs, or his financial records indicating the income generated or lost on the hog operation. While Ballhagen did provide copies of some checks he claimed were for the purchase of hogs,[7] no other records were provided.

Pruisner filed this lawsuit alleging Ballhagen converted over 3000 of his hogs. The case proceeded to a bench trial in April 2013. After hearing from fourteen witnesses and receiving into evidence thousands of pages of exhibits over a six-day trial, the court concluded,

> Ballhagen has provided no trustworthy evidence to support his proposition that he was independently raising hogs at the time. He had access to Pruisner's hogs at Ballhagen's facility, and there is no other reasonable explanation for where the hogs sold by Ballhagen came from. Pruisner's documentation and expert's analysis is consistent with the loss of a similar number of hogs. From this the court concludes that Ballhagen converted from Pruisner approximately 2800 hogs over the period of 2006-2008.

---

[6] Pruisner contacted the local sheriff with this information, and theft charges were filed against Ballhagen. After an eight-day bench trial in August 2011, the court found Ballhagen not guilty, concluding the State failed to prove beyond a reasonable doubt Ballhagen misappropriated, converted, or stole any hogs belonging to Pruisner.
[7] Two of these checks were later revealed to be for the purchase of go-karts and go-kart parts.

The court awarded Pruisner $290,000 for the hogs,[8] $21,314 in interest, $50,000 in punitive damages, and court costs. Ballhagen appeals, challenging the evidence supporting the court's liability finding and also the court's admission of certain exhibits over his hearsay objections.

## II. Scope and Standard of Review.

Our review of this law action is for the correction of errors at law. Iowa R. App. P. 6.907. The court's findings of fact carry the force of a special verdict and are binding if supported by substantial evidence. *Van Sloun v. Agans Bros. Inc.*, 778 N.W.2d 174, 179 (Iowa 2010). "Evidence is substantial to support a . . . verdict if reasonable minds would find it adequate to reach the same conclusion." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999). We view the evidence in the light most favorable to the verdict. *Id.* We will not weigh the evidence or evaluate the credibility of witnesses, and "[e]vidence is not insubstantial merely because it could support contrary inferences." *Keppy v. Lilienthal*, 524 N.W.2d 436, 438 (Iowa Ct. App. 1994).

We review a district court's decision to admit evidence over a hearsay objection for correction of errors at law. *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 181 (Iowa 2004).

## III. Substantial Evidence.

"Conversion is the wrongful control or dominion over another's property contrary to that person's possessory right to the property. In order to establish a conversion claim, the plaintiff must establish a possessory interest in the

---

[8] Ballhagan does not challenge the method the court used to arrive at the damage figure or the evidence to support the same.

property." *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010) (citations and internal quotation marks omitted). Ballhagen claims Pruisner failed to prove Pruisner had a possessory interest in the hogs Ballhagen sold at the Marble Rock station.[9] Ballhagen also asserts the court improperly shifted the burden of proof to Ballhagen to prove he owned the hogs sold at the Marble Rock station. Ballhagen notes that the hogs did not have any identifying characteristics showing which person owned the hogs, and he claims Pruisner's documentary evidence failed to prove Pruisner was missing any hogs.[10]

It was undisputed Pruisner was the owner of the hogs delivered to Ballhagen's facilities. It was also undisputed Ballhagen sold hogs at the Marble Rock station during the time Pruisner's hogs were at Ballhagen's facilities. The hogs sold at Marble Rock were either owned by Pruisner or owned by Ballhagen. As the documents generated by Pruisner's hog operation were irreconcilable, the district court turned to other evidence to determine who owned the hogs.

---

[9] Pruisner claims on appeal that Ballhagen failed to preserve error on this claim. We interpret Ballhagen's claim as a challenge to the sufficiency of the evidence to support an element of conversion. As this case was tried to the court, no specific objection or motion was necessary to preserve error for appeal when challenging the sufficiency of the evidence. *See* Iowa R. Civ. P. 1.904(2) ("But a party, on appeal, may challenge the sufficiency of the evidence to sustain any finding without having objected to it by such motion or otherwise.").

[10] A great deal of Ballhagen's brief is devoted to pointing out all the inconsistencies and discrepancies in the records Pruisner submitted in support of his claim. The district court here noted "accurate record keeping from nursery to market is difficult. Each player in the system kept his/its own records. Each of them contains inaccuracies and inconsistencies, and they are not necessarily reconcilable." The court in the criminal action likewise found math errors and inconsistency in the records presented by the State to prove Ballhagen stole the hogs. We conclude, consistent with every other tribunal who has reviewed these records, the documents are confusing and irreconcilable. There are missing records, and records seem to conflict with other records. No person involved in this case kept accurate records. However, the district court was still able to determine Pruisner met his burden of proof by establishing Ballhagen was not independently raising hogs during the relevant period of time.

First, the court accepted into evidence the tax returns filed by Ballhagen for the relevant years. Those returns show no income related to the sale of livestock Ballhagen raised, despite Ballhagen's assertions he was farrowing[11] his own sows.[12] On each of the tax returns, Ballhagen reported expenses for "feed," along with "veterinary, breeding, and medicine," but Ballhagen failed to produce any receipts or other documentation to support the numbers reported in response to discovery requests.

Ballhagen produced five checks he claimed he used to purchase hogs. Two of those five were later discovered to be for the purchase of go-karts and go-kart parts.[13] The other three checks Ballhagen claimed were for the purchase of seventy-five feeder pigs, sixteen gilts,[14] and fourteen barrows[15] for his child to show at the fair. Ballhagen produced no invoice or receipt to document the purchase of these pigs. This evidence falls far short of showing ownership of the 2864 hogs Ballhagen sold at Marble Rock from 2006-2008. From the third quarter of 2005 until the first quarter of 2008, Ballhagen claimed to have farrowed 2365 pigs, but he had no documentation to support the assertion.

During the relevant time period, Ballhagen was under a duty to submit annual financial statements for facilities loans he had with Iowa State Bank. On the balance sheet, Ballhagen reported no "market livestock or poultry" and no

---

[11] Farrowing refers to the act of breeding hogs.

[12] There was income reported on each of the tax returns for "sales of livestock and other items you bought for resale."

[13] The two checks to a company by the name of "L&J" totaled approximately $10,500, and while Ballhagen admitted those checks were not for the purchase of feeder pigs, he still maintained he purchased 550 feeder pigs from a company by the name of "L&J Farms" during that time period, though he had no documentation to support the assertion.

[14] A gilt is a young female hog who has not yet had a litter of pigs.

[15] A barrow is a male castrated hog.

"breeding stock." Ballhagen's loan officer testified if Ballhagen was selling pigs he would have expected Ballhagen to have disclosed the pigs he owned on the financial statements.

Ballhagen's father, Jerry, testified he ceased his hog operation in 1994, and since then, he has not kept any hogs on his property. Despite living at the property, Jerry was unable to recall whether Ballhagen kept hogs there during the years Ballhagen was custom feeding for Pruisner. Jerry testified, Ballhagen "could have. I don't know. I worked. I drove truck." The tenant farmer who farmed Jerry's property never saw any hogs or manure at the location when he was tending to the crop or accessing the equipment he kept in the storage shed on the property.

The day-to-day operation of Ballhagen's custom feeding operation was done by Ballhagen's employee, Jay Bacon, who has worked for Ballhagen since 2000. Despite their long-term employment relationship, Bacon had no knowledge as to whether Ballhagen was raising his own hogs at another location. However, he never noticed any hogs missing from the Pruisner operation either. Steve Albers observed the condition of Jerry's farm toward the end of the custom feeding contract in 2008 as part of his investigation into the missing hogs. It was his belief based on the condition of the buildings that there had not been hogs located at the facility in a long time.

Ballhagen's son, Michael, testified that he did raise hogs for 4-H for approximately two years in 2005 and 2006. These pigs were housed at Jerry's farm, and Michael recalled seeing other hogs on the farm other than his fair pigs. While he could not estimate the total number of hogs, he thought his dad had

about fifty sows.[16] Michael also testified that after the tornado hit the area in May 2008, he no longer saw hogs at his grandfather's farm.[17] Ballhagen's brother, Brent, testified there were hogs at his dad's farm until the tornado hit in 2008, though he never counted the hogs and could not provide an estimate.

Pruisner also offered the testimony of Brian Hargens, a veterinarian who specialized in swine and beef and who also had a hog operation. Based on his experience and education, Hargens believed it would be very difficult to raise over 2000 hogs from farrow to finish without vaccines, medication, or antibiotics. Though he did admit that absent a specific health problem, a hog operation would not require veterinary services.

Finally, Pruisner also offered the testimony of Kerry Bolt, a forensic accountant, who analyzed both the records from the custom feeding operation and also the financial records of Ballhagen. Bolt found it unusual Ballhagen could not produce records to support his assertions he was raising hogs. He analyzed Ballhagen's bank statements and sampled checks over a four-month period and did not find any significant payment for either hogs or feed to support the deductions taken on the tax returns. Based on the lack of evidence to support the purchase or feeding of the hogs from 2006 to 2008, it was Bolt's opinion the 2864 hogs Ballhagen sold were actually stolen from Pruisner. Also, based on his review of Ballhagen's tax returns and bank statements, it was Bolt's

---

[16] While Michael estimated there were fifty sows on the farm, Michael's grandfather, Jerry, testified the sow capacity for the facility was eighteen. In addition, Ballhagen's brother testified the farrowing house had sixteen stalls in it.

[17] The sale records from the Marble Rock station indicate the last load Ballhagen sold was on June 23, 2008. After the employee at the Marble Rock station confronted Ballhagen about the allegations Pruisner was making, Ballhagen ceased selling hogs.

opinion Ballhagen was spending significantly more money than he was reporting to have earned. After his analysis of Pruisner's records, Bolt concluded there were 3097 hogs unaccounted for.

After reviewing the evidence, the district court concluded Ballhagen was not independently raising hogs and cited the following evidence to support that conclusion.

- Ballhagen did not report income or expenses related to raising hogs on his tax returns.
- Ballhagen did not include hogs or related assets on his bank balance sheets.
- Ballhagen produced no feed, veterinary or other invoices or documentation consistent with raising hogs.
- Ballhagen produced no invoices, canceled checks or other documentation consistent with purchasing pigs.
- Ballhagen's dad ("Jerry") initially told an investigating deputy that there were no hogs on his property.
- Albers saw no sign of hogs on Jerry's property in 2008. ·
- Jerry's tenant saw no signs of hogs on the property.
- Jay Bacon—Ballhagen's employee who was intimately involved with Ballhagen's main site and who had worked with Ballhagen for years—had no knowledge that Ballhagen was personally raising hogs.
- The court finds against the credibility of Ballhagen's witnesses who testified that they helped with or observed hogs at Jerry's property.
- Ballhagen abruptly terminated marketing at the Marble Rock station once he was questioned about his personal sales.
- I give credit to expert Kerry Bolt's analysis of the documentation in that he arrived at approximately the same number as shown by the Marble Rock station sales records.
- I also find credible Bolt's conclusion that Ballhagen was spending significantly more than his reported income during the relevant time period.

We give deference to the district court's credibility determinations. *See Keppy*, 524 N.W.2d at 438. The hogs sold at the Marble Rock station were either owned by Ballhagen or Pruisner. Through the testimony of Bolt, Pruisner offered

evidence to show he was missing hogs, Ballhagen was not incurring expenses to raise hogs, and Ballhagen was spending more money than he was reporting as income. We conclude, based on our review of the record, substantial evidence supports the district court's conclusion Ballhagen converted Pruisner's hogs.

**IV. Hearsay.**

Next, Ballhagen challenges the court's admission of four exhibits over his hearsay objections. The exhibits include the summary Prusiner prepared to document the missing hogs, Pruisner's weekly calendars from 2005 to 2008, Prusiner's farm books, and Kerry Bolt's summary of the missing hogs. He claims the weekly calendar and the farm book contained hearsay statements making them inadmissible. The hearsay included reports Pruisner received from truckers and the slaughter house regarding the number of hogs slaughtered and the hogs' weights. Because the two summary documents were based on the information contained in the weekly calendar and the farm book, Ballhagen claims they too are inadmissible.

Ballhagen asserts these exhibits do not fall within the business records hearsay exception because the documents were not made by, or from information transmitted by, a person with knowledge. Because Pruisner did not personally observe the information he recorded in the weekly calendar and farm book, but instead received the information from the truckers and packing plant, Ballhagen asserts it does not fit within the business records exception to the hearsay rule. Without this evidence, Ballhagen claims Pruisner cannot show he is missing any hogs, and thus, Pruisner's conversion claim fails.

Iowa Rule of Evidence 5.802 provides, "Hearsay is not admissible except as provided by the Constitution of the state of Iowa, by statute, by the rules of evidence, or by other rules of the Iowa Supreme Court." Hearsay is defined in rule 5.801 as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Our rules of evidence provide certain exceptions to the hearsay rule, one of which is:

> (6) *Records of regularly conducted activity*. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and the regular practice of that business activity was to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 5.902(11), rule 5.902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Iowa R. Evid. 5.803(6). To satisfy this exception, the party seeking admission must establish:

> (1) That it is a business record;
> (2) That it was made at or near the time of an act;
> (3) That it was made by, or from information transmitted by, a person with knowledge;
> (4) That it was kept in the course of a regularly conducted business activity;
> (5) That it was the regular practice of that business activity to make such a business record.

*State v. Reynolds*, 746 N.W.2d 837, 841 (Iowa 2008). It is the third element that Ballhagen attacks.

When a group of hogs were ready for market, Pruisner would contact the trucker, direct him to the proper farm, and then receive a report from the trucker

after the hogs were delivered to market as to the number of hogs and their average weight. The trucker would receive this information from the packing plant. Pruisner would then record this information on the weekly calendar. The substance of the information transmitted, i.e., the weight and count, came from the packer who was purchasing the hogs from Pruisner. The numbers were conveyed to Pruisner by the trucker, who Pruisner employed to transport the hogs to market and to report back the information. Pruisner explained the trucker remained at the packing plant scale and had to bring the group across the scale before he could leave the location, though the trucker did not actually do the weighing and counting, the packing plant did.

The information recorded in the weekly calendar and farm book by Pruisner was transmitted to him by the trucker, who had the first-hand knowledge of the information by virtue of being present at the packing plant when the hogs were counted and weighed. The numbers reported by the trucker were later verified by the "kill sheet" the packing plant sent to Pruisner and the receipt that later accompanied the check. We conclude the information Prusiner recorded in the calendar and farm book was communicated to Prusiner by a person with knowledge, and therefore, the business records exception to the hearsay rule has been satisfied in this case. The trial court did not err in admitting the exhibits challenged.

**V. Conclusion.**

Giving deference to the district court's credibility determinations, we conclude substantial evidence supports the district court's finding Ballhagen converted hogs belonging to Pruisner. Expert testimony supported both the

conclusion Prusiner was missing hogs and Ballhagen was not independently raising hogs on his own.  This supports the conclusion Pruisner was the owner of the hogs Ballhagen sold at market.  In addition, we conclude the court did not err in admitting the weekly calendar and farm book Pruisner maintained in his farming operation, or the summary exhibits that relied on those exhibits, as those records met the business records hearsay exception.

**AFFIRMED.**